693 A.2d 1229

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. MARTIN TACCETTA, DEFENDANT–
APPELLANT. (TWO CASES)

Superior Court of New Jersey
Appellate Division

Argued February 4, 1997—Decided May 23, 1997.

228

Before Judges MICHELS, MUIR, Jr., and KLEINER.

*John J. Gibbons* argued the cause for appellant Martin Taccetta (*Crummy, Del Deo, Dolan, Griffinger & Vecchione,* and *Ruhnke & Barrett,* attorneys; *Mr. Gibbons, Lawrence S. Lustberg,* and *David A. Ruhnke,* on the brief).

*Michael Critchley,* attorney for appellant Michael Taccetta.

*Robert E. Bonpietro,* Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General, attorney; *Mr. Bonpietro,* of counsel and on the brief).

The opinion of the court was delivered by

MUIR, Jr., J.A.D.

A State Grand Jury indictment is the legal genesis for these appeals by defendants Martin and Michael Taccetta which we have consolidated for opinion purposes. The factual genesis is the

Taccetta brothers' participation in an organized criminal enterprise known as La Cosa Nostra (LCN), literally "Our Thing."

A State Grand Jury indicted the Taccetta brothers, Anthony Accetturo, Thomas Ricciardi, Michael Ryan, and Joseph Sodano in a seven-count indictment. The indictment charged: Accetturo, the Taccettas, Ricciardi, Ryan, and Sodano with second-degree racketeering conspiracy (count one, *N.J.S.A.* 2C:41–2b, c); Accetturo, Ricciardi, and Martin Taccetta with first-degree racketeering (count two, *N.J.S.A.* 2C:41–2c; 2C:2–6); Accetturo with second-degree leader of organized crime (count three, *N.J.S.A.* 2C:41–1; 2C:5–2g); Ricciardi, Martin Taccetta, and Ryan with first-degree murder (count four, *N.J.S.A.* 2C:11–3a(1), (2); 2C:2–6); Accetturo, Michael Taccetta, Martin Taccetta, and Ricciardi with two counts of second-degree theft by extortion (counts five and six, *N.J.S.A.* 2C:20–5; 2C:2–6); and Accetturo and Ricciardi with second-degree theft by extortion (count seven, *N.J.S.A.* 2C:20–5; 2C:2–6).

All defendants except Sodano were tried together before a jury. On August 13, 1993, the jury found Martin Taccetta guilty of counts one, two, five, and six, consisting of the racketeering conspiracy supported by two predicate acts, as well as the substantive offenses of racketeering and extortions of Pasquale and Vincent Storino, but acquitted Martin of the murder of Vincent Craporatta. The jury also found Michael Taccetta guilty of counts one, five, and six. Although not relevant to these appeals, the jury found Accetturo and Ricciardi guilty on all counts but acquitted Ryan on all counts.

The trial court found Martin Taccetta eligible for an extended term sentence both as a persistent offender and as a professional criminal. *See N.J.S.A.* 2C:44–3a, b. The court, after merging count one into count two, sentenced Martin as follows: life with 25 years parole ineligibility on count two; 10 years with 5 years parole ineligibility on count five consecutive to the term on count two; and 10 years with 5 years parole ineligibility on count six concurrent with count five but consecutive to count two. The

court also imposed required Violent Crimes Compensation Board (VCCB) penalties.

The court similarly found Michael Taccetta eligible for an extended term and sentenced him to 20 years with 10 years parole ineligibility on count one, 10 years with 5 years parole ineligibility on count five consecutive to the sentence on count one; and 10 years with 5 years parole ineligibility on count six to run consecutive to the sentence on count five. The court also imposed required VCCB penalties.

Both Taccettas appeal. Martin contends:

POINT I

THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN MARTIN TACCETTA'S CONVICTION FOR EXTORTION.

POINT II

THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN MARTIN TACCETTA'S CONVICTION FOR RACKETEERING.

A. The Statute.

B. There was Insufficient Evidence Of Two Incidents Of Racketeering Conduct.

C. The State Failed To Show The Required Continuity to Establish A Pattern Of Racketeering Activity.

 1. The Requirement of Continuity Under New Jersey Law.

 2. The Failure to Prove Continuity.

POINT III

THE TRIAL COURT ERRED IN ADMITTING A CRITICAL TAPE RE-CORDING OF A CONVERSATION BETWEEN JOHN JANUSKA AND JOSEPH SODANO, WHICH CONVERSATION WAS HEARSAY NOT IN FURTHERANCE OF A CONSPIRACY.

POINT IV

THE PROSECUTOR'S SUMMATION, DURING WHICH HE REPEATEDLY DENIGRATED DEFENSE COUNSEL, INFORMED THE JURY THIS WAS A CASE OF "US" AGAINST "THEM" IN WHICH IT WAS "UP TO YOU," EXCEEDED ALL BOUNDS OF RESPONSIBLE ADVOCACY AND DE-NIED APPELLANT THE FAIR TRIAL GUARANTEES OF THE STATE AND FEDERAL CONSTITUTIONS.

POINT V

APPELLANT TACCETTA SHOULD HAVE BEEN SENTENCED AS A SECOND DEGREE OFFENDER ON COUNT TWO, AS HIS OFFENSE DID NOT INVOLVE VIOLENCE OR THE USE OF FIREARMS.

Michael contends:

*POINT ONE:*

THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN MICHAEL TAC-CETTA'S CONVICTIONS ON COUNTS FIVE AND SIX FOR EXTORTION.

*POINT TWO:*

THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN MICHAEL TAC-CETTA'S CONVICTION FOR CONSPIRACY TO COMMIT RACKETEER-ING.

*POINT THREE:*

THE TRIAL COURT ERRED IN ADMITTING A CRITICAL TAPE RE-CORDING OF A CONVERSATION BETWEEN JOHN JANUSKA AND JOSEPH SODANO, WHICH CONVERSATION WAS HEARSAY AND NOT IN FURTHERANCE OF A CONSPIRACY.

*POINT FOUR:*

THE PROSECUTOR'S SUMMATION, DURING WHICH HE REPEATEDLY DENIGRATED DEFENSE COUNSEL, INFORMED THE JURY THIS WAS A CASE OF "US" AGAINST "THEM" IN WHICH IT WAS "UP TO YOU," EXCEEDED ALL BOUNDS OF RESPONSIBLE ADVOCACY AND DE-NIED APPELLANT THE FAIR TRIAL GUARANTEES OF BOTH THE STATE AND FEDERAL CONSTITUTIONS.

*POINT FIVE:*

FOR PURPOSES OF SENTENCING, THE TRIAL COURT SHOULD HAVE MERGED THE RACKETEERING CONSPIRACY AND THE SUBSTAN-TIVE OFFENSES OF EXTORTION.

A. The lack of evidence that the promotion of gambling was an object of the conspiracy.

B. Even assuming the gambling predicate was properly found, the extortions should have been merged, for sentencing purposes, with the conspiracy.

*POINT SIX:*

FOR SENTENCING PURPOSES, THE TRIAL COURT SHOULD NOT HAVE TREATED THE STORINO EXTORTION AS SEPARATE OF-FENSES AND SHOULD NOT HAVE IMPOSED CONSECUTIVE SEN-TENCES.

Michael, on points one through four, adopts by reference the arguments set forth in Martin's brief.

We reject all the contentions. Accordingly, we affirm both judgments of conviction. All contentions raised but not specifical-ly addressed in this opinion are considered to be without merit. *R.* 2:11–3(e)(2).

*I.*

The State presented a plethora of evidence. Nonetheless, we limit our review to those facts relevant to resolution of the appeals and certain background facts essential to an understanding of the scope of the complex criminal enterprises involved.

The State produced the testimony of two members of LCN, Phillip Leonetti, a member of the Bruno–Scarfo family, and Alphonse D'Arco, a member of the Lucchese family, to explain LCN's hierarchical structure, its purposes, the scope of its business, its methodology, and the terminology used by its members.

Nationally, the LCN is governed by a commission. The commission supervises the overall operation of the several families. There are five families in the Greater New York area, a Philadelphia family, and a Chicago family. In this instance, we are concerned only with the New York-based Lucchese family and the Philadelphia-based Bruno–Scarfo family and their continuing efforts to control criminal ventures in New Jersey, New York, and Pennsylvania.

Each LCN family has the same structure. In order of apparent rank, there is the family boss, the underboss, and the consigliere or counselor. Beneath that triumvirate are captains or capos, who manage crews made up of soldiers. The families also have large numbers of associates who are subject to family direction and control. The chain of command is from the boss down the line through the capos to the soldiers and associates.

All but associates are "made" or initiated members of LCN families. A member and the activities by which he makes money for the crime family are referred to as "with" his crime family, and those ventures, mainly illegal, must be put "on record" with the member's capo, a process by which the member informs the capo of his activities, gets approval from the upper echelons of the family, and arranges for the funds received from the operations to be paid to the family.

The crime family provides protection for all its members operating within its geographic region, recognized by other organized crime families, as within the control of a particular family. Disputes between families are normally resolved by a "sit down," a method of dispute resolution. Disputes with anyone who is not a member of the LCN are settled with threats and, if necessary, violence, which often includes murder. A member's violation of family rules is punishable by death. Death is the only means of leaving membership.

The LCN is in the business of making money according to the testifying members. It does so through bookmaking, loan sharking, extortion, murder, kidnapping, theft, and promoting gambling. The extortion is of both legitimate and illegitimate businesses. Leonetti testified his crime family extorted money from loan sharks, bookmakers, and drug dealers. The LCN promotes gambling by purchasing video slot machines and placing them in taverns, restaurants, and other businesses. It shares the net weekly revenue from the machines with the business owners. The families also "share" in the profits of slot machine manufacturers. It is the Lucchese family's extortion of principals of a manufacturer of slot machines, agreed to by the Bruno–Scarfo family, that gave rise to the Taccetta brothers' convictions.

SMS was a business that manufactured Joker Poker video slot machines for illegal gambling in taverns, restaurants, and other establishments. Both the Lucchese family and the Bruno–Scarfo family used the Joker Poker machines. The principles of SMS were Pat Storino, Sal Mirando, and Pat's brother, Vincent Storino. According to Leonetti, in the early 1980s, the Bruno–Scarfo Joker Poker locations in northern New Jersey were run by family member Joe Sodano.

During 1981 or 1982, Leonetti first met Martin Taccetta, who was introduced to him as a member of the Lucchese family. Later, in June 1984, Leonetti met with Martin Taccetta in an attempt to resolve a dispute between the Bruno–Scarfo family and

the Lucchese family over control of Joker Poker machines and their manufacturer, SMS.

A series of five meetings ensued. The first meeting occurred at an Atlantic City restaurant, Angelino's. Martin Taccetta informed Leonetti that the Lucchese family, and particularly Martin, wanted to control and "shake down" SMS. At the time, Leonetti knew but did not tell Martin that Sal Mirando was an associate of Joe Sodano and that Sodano was the Bruno–Scarfo crime family member who derived income for the family from Mirando by permitting SMS to operate in New Jersey. During Leonetti's direct examination in which he explained his first meeting with Martin Taccetta, the colloquy between the prosecutor and Leonetti went as follows:

Q. Again, so it's clear, Mr. Sodano had an interest with Mr. Mirando?

A. Yes.

Q. And Mr. Taccetta was talking to you not about Mr. Mirando, but about—

A. Pat Storino.

Q. The Storinos?

A. Yes.

Leonetti testified that, during the time the Bruno–Scarfo family controlled Mirando, Ralph Natoli, the Bruno–Scarfo capo for North Jersey, brought to the family $1,500 per month as income from Mirando and "sometimes he would bring another five thousand dollars." Natoli's capo replacement raised the income to "a steady four thousand dollars a month, and every so often he would give five and ten thousand dollars."

At Leonetti's first meeting, Martin sought to determine whether Charles Costello, a Bruno–Scarfo family member, put Pat Storino "on record" with the Bruno–Scarfo family. When Leonetti responded, "I don't think so" and asked why, Martin said, "[W]e just killed this guy's uncle. This guy's uncle [sic] name was Jimmy Sinatra and we're trying to claim this Pat Storino, and this Pat Storino went to Charles Costello. Now Charlie Costello is trying to claim him." Leonetti left the meeting agreeing to talk to Costello. Martin Taccetta similarly admitted to Alphonse D'Arco at about the same time that Tom Ricciardi had the police after him

because, "We whacked this guy Craporatta. We whacked him with . . . a golf club." "Whack" is a crime family expression for kill. Tom Ricciardi, in another meeting with Leonetti and Martin Taccetta, admitted killing Craporatta.

Vincent Craporatta, alias Jimmy Sinatra, was murdered on June 14, 1984. Eyewitnesses identified codefendant Tom Ricciardi, a "made" member of the Lucchese family, as the one who delivered the fatal blows with a golf club which shattered Craporatta's skull. As Ricciardi delivered the beating, he was heard to have yelled "pay your debts" and "machines." Craporatta was a known associate of the Lucchese family with ties to organized crime activities in Ocean County for many years. He was the Storinos' uncle.

Before their second meeting at Angelino's two weeks later, Leonetti checked with Charlie Costello. Costello told Leonetti that Pat Storino had come to him stating he was afraid of Ricciardi because Ricciardi had told Storino that Ricciardi had killed Storino's uncle. Storino offered $1,000 a week tribute if he could be "with" the Bruno–Scarfo family.

Martin Taccetta brought Tom Ricciardi to the second meeting with Leonetti. At that meeting, Leonetti relayed Costello's message that a member of the Lucchese family, Timmy Murphy, had given Pat Storino to Costello twenty years before. Martin Taccetta claimed Costello lied and nothing was resolved.

Subsequently, there were two "sit downs" between the Lucchese and Bruno–Scarfo families to resolve the dispute. The first meeting occurred in July at a basement restaurant in the Little Italy section of New York City. The Bruno–Scarfo family was represented by boss Nick Scarfo, then underboss Leonetti, capo Lawrence Merlino, capo Ralph Natoli, and soldier Charlie Costello. The Lucchese family was represented by boss Tony Corallo, underboss, at the time, Tom Santoro, and soldiers Michael Taccetta, Christopher Funari, Angelo Russo, and Michael Perna.

Michael Taccetta spoke for the Lucchese family. Michael reiterated Martin's claim to Pat Storino and denied Costello's claim. Costello asserted Tim Murphy "gave him" Pat Storino twenty years ago. Costello also discussed Pat Storino being "scared to death of these guys." An angry Corallo interjected, stating to Costello that "if they don't want to come up with any money or they don't want to be with us, we're going to show them. We're going to kill them. They deserve it." Corallo then suggested to Nick Scarfo there should be a meeting in Florida with Lucchese family member Timmy Murphy in attendance. "[W]e send a representative from your family and I'll have a representative of my family there and we'll get Timmy Murphy and we'll ask him, and whatever he says, if he says he gave him Charlie, then he'll be with your family, and if he says he didn't give him to your family, then he'll be with us." Nick Scarfo agreed.

The criminal families resolved the claim to the Storinos at an early August 1984 meeting in Miami, Florida. Leonetti arrived at the meeting with Martin Taccetta and Tom Ricciardi. Costello came with Pat Storino and Joe Sodano. Accetturo was the principal spokesperson for the Lucchese family.

According to Leonetti, Timmy Murphy denied ever giving Pat Storino to Costello and the die was cast. Costello then said to Storino, "Pat, that's Anthony Accetturo. [He's] a nice man. Listen to whatever he says. He'll take care of you. You'll be with him now." At that point, with Pat Storino exhibiting signs of being upset—"turned purple," "sweating," "very scared"—Accetturo, on behalf of the Lucchese family, laid claim to Pat Storino. Accetturo said, "I told you you would always be with me. No matter where you went or how you tried to get away, you would be with me, you and *your whole family*." (Emphasis added.)

Accetturo then sent for Tom Ricciardi. Storino told Accetturo he did not want to deal with Ricciardi because Ricciardi killed his uncle and he was very frightened of him and felt Ricciardi wanted to kill him. Leonetti testified that Accetturo responded, "[T]he reason they killed his uncle, because he don't want to come up

with any money, he don't want to be with him and he don't want to pay. That's the reason why he got killed. But as long as you do the right things, you have nothing to worry about."

In an apparent effort to authenticate the Lucchese crime family's claim to Pat Storino, Accetturo said, "Pat, didn't you give me a bag of money one time concerning this business?" When Pat said yes, Accetturo turned to Leonetti and said, "See, Phillip, I was making money with this guy already."

Leonetti also testified that the Lucchese crime family made no claim to Bruno–Scarfo crime family income received from Sal Mirando through Joe Sodano. After the Florida meeting, Leonetti continued to coordinate illegal activities with Martin and Michael Taccetta on behalf of the Lucchese crime family. D'Arco testified, despite Lucchese crime family internal problems, Michael and Martin remained loyal to the family through 1990.

Although the Lucchese crime family disavowed any desire to control Sal Mirando's interest in SMS at the Florida meeting, it subsequently had a change of heart according to a taped conversation of Joe Sodano acquired by John Januska,[1] a Bruno–Scarfo family associate who agreed to cooperate with law enforcement officials after being arrested in 1989. Januska, who had abandoned his gambling interests to avoid being "whacked," sought Sodano's assistance by feigning a desire to reinstate his gambling activities for the Bruno–Scarfo family.

According to Januska, Ricciardi was threatening Mirando in 1990 to make a deal with the Storinos and get out of SMS or be killed. In addition to the manufacture of Joker Poker machines, SMS owned businesses on the Point Pleasant boardwalk and, in the conversation Januska taped in 1990, Sodano said he had advised Mirando to take the $2.5 million the Storinos had offered for the boardwalk businesses, even though this amount was millions less than their true value, since such a deal would keep

---

[1] This conversation is referred to in more detail under Point IV of this opinion.

Mirando from being killed and would leave him with the Joker Poker business. A contract was executed which reflected the division of SMS in January 1990 whereby Mirando retained the gambling machine operation and the Storinos acquired the boardwalk properties. In the same taped conversation, Sodano referred to statements by Ricciardi where he had claimed the Storinos' interest in SMS for the Lucchese crime family and where Ricciardi stated Pat Storino paid $1,000 per week to the Lucchese family. Sodano also related the circumstances of the 1984 Florida meeting essentially verifying Leonetti's version of that meeting.

Based on the foregoing and other evidence, the jury returned the verdicts of guilt previously noted, the trial court imposed sentences, and these appeals ensued.

## II.

■ Martin and Michael Taccetta collectively contend the evidence was insufficient to support the two charges of extortion, as set out in counts five and six of the indictment. We disagree.

In *State v. Reyes*, 50 *N.J.* 454, 458–59, 236 *A.*2d 385 (1967), the Court set forth the test for evaluating the sufficiency of evidence:

[W]hether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.

The standard applies to both trial court and appellate court review. *See State v. Kittrell*, 145 *N.J.* 112, 130, 678 *A.*2d 209 (1996). The approach is the same whether the evidence is direct or circumstantial. *State v. Mayberry*, 52 *N.J.* 413, 437, 245 *A.*2d 481 (1968), *cert. denied*, 393 *U.S.* 1043, 89 *S.Ct.* 673, 21 *L. Ed.*2d 593 (1969). In that approach, we must recognize "that a jury may draw an inference from a fact whenever it is more probable than not that the inference is true; the veracity of each inference need not be established beyond a reasonable doubt in order for the jury to draw the inference." *State v. Brown*, 80 *N.J.* 587, 592, 404 *A.*2d 1111 (1979). Circumstantial evidence need not preclude every

other hypothesis in order to establish guilt beyond a reasonable doubt. *Mayberry, supra,* 52 *N.J.* at 436, 245 *A.*2d 481. Additionally, it is a jury function, not the function of the reviewing court, to evaluate witness credibility and the weight and worth of the evidence. *See State v. Ingenito,* 87 *N.J.* 204, 211, 432 *A.*2d 912 (1981). Appellate review is limited to the correction of injustice resulting from a plain and obvious failure of the jury to perform its duty. *State v. Butler,* 32 *N.J.* 166, 195, 160 *A.*2d 8, *cert. denied,* 362 *U.S.* 984, 80 *S.Ct.* 1074, 4 *L. Ed.*2d 1019 (1960).

*N.J.S.A.* 2C:20-5 provides that a person is guilty of theft by extortion if he purposely and unlawfully obtains property of another by extortion. A person extorts if he purposely threatens to inflict bodily harm. *N.J.S.A.* 2C:20-5a.

The Taccettas contend the record shows only that Pat Storino made payments to Accetturo with no evidence that either of them personally threatened Storino. Even if this is enough to show extortion of Pat Storino by the Taccettas, they claim there is "no proof whatsoever of any extortion of Vincent Storino, or that either of them ever personally threatened Vincent." They also paralogically argue, because the Storinos were criminals themselves, the law of extortion does not apply to their activities, contending any payments made to be a voluntary aspect of the criminal process. Although we find comments appropriate, we reject all these contentions. Our comment on the paralogical argument is limited due to its lack of merit. *R.* 2:11-3(e)(2). As to that contention, we need only point to the lack of statutory basis to evidence the fallacy of its reasoning. The law prohibits all extortion, be it of the operator of a criminal enterprise or of a legitimate enterprise.

The Taccettas claim there is no proof they threatened Vincent Storino or extorted money from him. The claim overlooks not only legitimate inferences from the evidence but also the fact that the Taccettas were charged as accomplices in the extortion of both victims.

Legitimate inferences from the evidence disclose threats of bodily harm to both Pat and Vincent Storino. Martin Taccetta, at his first meeting with Leonetti, talked of the Lucchese's intentions to shake down Pat Storino, which Leonetti indicated was synonymous with "The Storinos." Michael Taccetta, at the New York meeting, reiterated the Lucchese's right to extort from Pat Storino, a statement which any reasonable trier of fact could infer included Vincent Storino since it was the Storinos' interest in SMS and not Mirando's interest they sought to claim for the Lucchese family. Accetturo's statements at the Florida meeting that Pat Storino and "his whole family" were now "with" the Lucchese family more substantively established a legitimate inference that Vincent Storino was included in the scope of the Lucchese family's "claim." Additionally, in the taped conversation of June 21, 1990, Sodano confirmed both Storinos were "with" the Lucchese family after the Florida meeting. Sodano told Januska how he had tried to convince Nick Scarfo that because both Pat and Vincent Storino were "big money makers" they should be with the Bruno–Scarfo family, clear evidence that both Storinos were the object of the Lucchese family claim. When that evidence is considered in conjunction with the abundance of evidence that Tom Ricciardi killed Vincent Craporatta on behalf of the Lucchese family because he did not pay appropriate tribute and that Ricciardi and Accetturo reminded Pat Storino that Craporatta died for this reason, legitimate inferences support a conclusion the threats directed at Pat Storino, which made him so vividly fearful, also were directed at Vincent Storino and that Vincent was well aware of them.

Of equal probability, and therefore legitimately inferable, is that the extortion payments continued after the Florida meeting. Accetturo stated that he got a bag of money from Pat Storino prior to the Florida meeting. This, when combined with the extensive circumstantial evidence of threats to the Storinos, as well as Craporatta's murder for his failure to pay tribute to the Lucchese family, created a clear predicate for legitimate inferences that the Storinos paid extortion money to the Lucchese family after the

meeting and continued to do so after the Storinos bought out Mirando's interest in the boardwalk businesses as the result of threats by Ricciardi.

Sodano's conversation with Januska confirmed the continued extortion of the Storinos. Ricciardi, the Lucchese soldier to whom Accetturo gave control of the Storinos at the Florida meeting, confirmed in a conversation with Sodano that Pat Storino paid Ricciardi $1,000 per week.

"Conspirators are treated as accomplices under *N.J.S.A.* 2C:2–6, and hence are guilty of the same substantive offense as the principal." *State v. Curry,* 109 *N.J.* 1, 9, 532 *A.2d* 721 (1987). That axiom demonstrates why legitimate inferences from the above evidence apply with equal force to the Taccettas as they do to Accetturo and Ricciardi.

The Taccettas assert that to be convicted they must have personally threatened the extortion victims. This claim, as noted, overlooks the fact that they were charged as accomplices in the extortion of both victims. The trial court instructed the jury on accomplice liability as defined in *N.J.S.A.* 2C:2–6.

A defendant is legally liable for the conduct of another if, with the purpose of promoting or facilitating the commission of a crime, defendant "[a]ids or agrees or attempts to aid" another person in planning or committing the offense charged. *N.J.S.A.* 2C:2–6; *State v. McKiver,* 199 *N.J.Super.* 542, 549, 489 *A.2d* 1256 (App.Div.1985); *see also* II *Final Report of the New Jersey Criminal Law Revision Commission, The New Jersey Penal Code* 57 (1971). "[D]irect or indirect participation in the commission of the criminal act where there is the shared purpose to achieve the criminal objective renders one guilty of the criminal act." *State v. Kamienski,* 254 *N.J.Super.* 75, 96, 603 *A.2d* 78 (App.Div.), *certif. denied,* 130 *N.J.* 18, 611 *A.2d* 656 (1992).

The aggregate of these principles of accomplice liability are that, if a defendant acts in concert with others, the evidence with its legitimate inference can be sufficient to establish extortion

despite the fact that the defendant did not personally threaten or assault the victim who is the object of the extortion. *See Pinkerton v. United States,* 328 *U.S.* 640, 647–48, 66 *S.Ct.* 1180, 1184, 90 *L. Ed.* 1489, 1496–97 (1946) (co-conspirator's actions in furtherance of a conspiracy are attributed to other co-conspirators); *United States v. DiSalvo,* 34 *F.*3d 1204, 1212 (3d Cir.1994) (although defendants never threatened the victim of an extortionate attempt to collect a debt, the jury could reasonably have found they capitalized on the victim's fear of their organized crime connections); *United States v. Crockett,* 979 *F.*2d 1204, 1212–14 (7th Cir.1992) (defendant declared that the extortion victim was "under his wing" and "with" his crime family), *cert. denied,* 507 *U.S.* 998, 113 *S.Ct.* 1617, 123 *L. Ed.*2d 176 (1993).

Here, the jury could reasonably have found the Taccettas criminally liable for the threats made to both Storinos based on their participation, directly and indirectly, in the extortions. Reasonable inferences abound to support that criminal liability. Martin Taccetta initiated Lucchese family efforts to claim the Storinos. Those efforts resulted in the New York "sit down." The legitimate inferences from that conduct are that Martin Taccetta solicited and aided the Lucchese family in setting up the extortion of the Storinos by arranging the meetings with the Bruno–Scarfo family. Michael Taccetta, at the New York meeting, by acting as spokesperson for the Lucchese family, provided a basis upon which the jury could reasonably find that he participated in and agreed with the plans and the eventual extortion of the Storinos. The Taccettas' participation in the Lucchese family plan culminated in the Florida meeting and Accetturo's statement that Pat Storino and his whole family were "with" Accetturo and thus "with" the Lucchese family. Those statements, combined with all other statements and acts by Lucchese family members in their efforts to extend their talons into a new prey, the Storinos, to the exclusion of other crime families, provided grounds for the jury to reasonably conclude that both Taccettas were, as accomplices, criminally liable for all related threats and financial extortions. Consequently, we are satisfied the jury had before it sufficient

evidence from which it could reasonably conclude both Taccettas were guilty beyond a reasonable doubt of continuous acts of extortion of both Storinos.

### III.

■ Martin Taccetta next contends there was insufficient evidence to sustain his conviction for racketeering under count two. Michael Taccetta adopts by reference the arguments raised in Martin's brief and asserts there was insufficient evidence to support his conviction for racketeering conspiracy under count one. Applying the standard of review required by *Reyes, supra,* and the Supreme Court's holdings in *State v. Ball,* 141 *N.J.* 142, 661 *A.*2d 251 (1995), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 779, 133 *L. Ed.*2d 731 (1996), we find the contentions unpersuasive.

*N.J.S.A.* 2C:41-2c makes it "unlawful for any person employed by or associated with any enterprise" to "conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity." The RICO conspiracy proscribed by *N.J.S.A.* 2C:41-2d consists of an agreement to violate the substantive provisions of the RICO Act. *Ball, supra,* 141 *N.J.* at 176, 661 *A.*2d 251.

The source of New Jersey's RICO Act (Racketeer Influenced and Corrupt Organizations Act), *N.J.S.A.* 2C:41-1 to -6.2, is the federal RICO Act, 18 *U.S.C.A.* §§ 1961 to 1968. *Ball, supra,* 141 *N.J.* at 156, 661 *A.*2d 251. As a result, federal legislative history and case law is useful in construing New Jersey's RICO law where the provisions do not significantly differ. *Ibid.*

A "pattern of racketeering" has a definition under New Jersey's RICO law significantly different from federal law. Nonetheless, defendants rely on federal cases to support the contention that the evidence against them was insufficient to demonstrate the "relatedness" and "continuity" required to prove a "pattern of racketeering" as that term is interpreted under federal law. The majority of this argument, made while review was pending before the Supreme Court in *Ball,* is an attempt to discredit this court's

decision in *State v. Ball*, 268 *N.J.Super.* 72, 632 *A.*2d 1222 (App. Div.1993), and rests on the assertion that decision is erroneous and should be rejected by this panel. The essence of the argument has been rendered moot by the Supreme Court's decision in *Ball*, which affirmed our reported decision. Martin Taccetta's reply brief, written after the Supreme Court's *Ball* decision, downplays but does not expressly abandon the claim of need for proof of both relatedness and continuity. Consequently, we address it briefly.

Racketeering activity encompasses a number of listed crimes, including murder, extortion, and gambling. *N.J.S.A.* 2C:41–1a(1). A pattern of racketeering requires:

> (1) Engaging in at least two incidents of racketeering conduct one of which shall have occurred after the effective date of this act [June 5, 1981] and the last of which shall have occurred within 10 years (excluding any period of imprisonment) after a prior incident of racketeering activity; and
>
> (2) A showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents.
>
> [*N.J.S.A.* 2C:41–1d(1), (2).]

In contrast to proof of two "incidents," the federal law requires proof of two acts. 18 *U.S.C.A.* § 1961; *Ball, supra*, 141 *N.J.* at 165–66, 661 *A.*2d 251.

The Court in *Ball* concluded that "the primary criterion of New Jersey's 'pattern of racketeering activity' is 'relatedness.' That calls for the application of a broad standard involving the totality of the circumstances, which may include continuity." *Ball, supra*, 141 *N.J.* at 169, 661 *A.*2d 251. Thus, while the Supreme Court agreed with this court's conclusion that continuity is not required as an element of a pattern of racketeering activity, continuity may have some relevance when the totality of circumstances approach is employed. In doing so, the Court stated, "[t]he pattern of racketeering activity and the activity criminalized under RICO should be, or threaten to be, ongoing." *Id.* at 167, 661 *A.*2d 251. It does not, however, require individualized proof of both . continuity and relatedness. Consequently, we reject the

Taccettas' argument, to the extent it has not been abandoned, that relatedness and continuity are separate elements required to establish a pattern of racketeering activity.

The remaining arguments are that Martin's racketeering conviction and Michael's conspiracy conviction must be set aside as a matter of law because the State failed to prove the requisite two criminal acts to sustain pattern of racketeering convictions. Defendants predicate their claims on the contention the State proved only one act of extortion, the threat made by Accetturo to Pat Storino at the Miami "sit down." Our review of the record satisfies us the State presented ample evidence to prove a pattern of racketeering committed by Martin Taccetta and a conspiracy to do so by Michael Taccetta. *See Reyes, supra,* 50 *N.J.* at 458–59, 236 *A.*2d 385.

Defendants' contentions overlook again not only their accomplice liability but also the reasonable inferences that can be drawn from the State's evidence. The evidence demonstrates a pattern of racketeering activity under the totality of the circumstances by establishing incidents that were related and neither isolated nor disconnected. *See Ball, supra,* 141 *N.J.* at 185, 661 *A.*2d 251. One incident of extortion defendants concede is Accetturo's extortion of Pat Storino. Since that extortion, as we have noted, was also an extortion of Vincent Storino, there were two incidents of extortion. Both extortions were unlawful incidents sufficient to establish two predicate acts, predicate acts for which the Taccettas were criminally liable as accomplices and co-conspirators.

Beyond that, the pattern of racketeering, the continued extortion from the Storinos, was reasonably inferable from Ricciardi's representations to Sodano that he collected $1,000 per week from the Storinos, a collection that came to fruition as the result of the conversations initiated by Martin Taccetta with Leonetti, continued by Michael Taccetta, and finalized at the 1984 Florida meeting.

It belies logic to suggest that a jury could not reasonably determine that, once having settled through the "sit down" con-

spiracy process of the LCN their right to exclusive extortion of the Storinos, the Lucchese family extortions of the Storinos continued thereafter. That such an inference can be drawn is further supported by Ricciardi's intimidation of Mirando, which led to the latter's sell-out of his boardwalk business interests. Ricciardi's and consequently the Lucchese crime family's interest in Mirando's disadvantageous sell-out could only exist if the Storinos were still well fixed in the Lucchese family's grip.

The Taccettas were co-conspirators in an enterprise that filled the Lucchese family's coffers through intimidation based on express and implied threats of bodily injury or death. They were criminally liable for all the substantive offenses that were the objects of the conspiracy. The State presented an abundance of evidence from which a reasonable jury could find, beyond a reasonable doubt, more than two incidents of racketeering conduct within the 10–year period identified in the indictment. Accordingly, we reject the arguments raised by both defendants.

*IV.*

Both Taccettas also assert the trial court erred in admitting into evidence a tape recording of a 1990 conversation between John Januska, who wore a "wire" provided by state law enforcement, and Joe Sodano. We find the argument unavailing. We review the conversation in its entirety to demonstrate its relevancy to the conspiracy.

Januska was a long-time member of the Bruno–Scarfo crew in Newark who ran gambling and loan sharking operations through 1984. In 1984, Januska moved to Ocean County, stopped his involvement in gambling, and concentrated on illegal loans until 1988, when he again began to operate illegal gambling establishments in northern New Jersey until his arrest in 1989. After his arrest, Januska cooperated with law enforcement authorities. As part of his cooperation, he taped conversations with persons involved in LCN, including a conversation with Sodano on June 21,

1990. The State presented the tape as evidence for consideration by the jury.

After the trial court resolved objections to the accuracy of the transcript of the recorded conversation, all defendants generally objected to the admission of both the tape and an accurate transcription of it on the ground that it failed to fit within the hearsay exception for statements of a co-conspirator under the *Evid.R.* 63(9), now *N.J.R.E.* 803(b)(5), as interpreted by *State v. Phelps*, 96 *N.J.* 500, 476 *A.*2d 1199 (1984).

The trial court admitted the recording due to the context in which the statements were made. It found that Sodano's statements about the 1984 resolution of the SMS dispute were made to explain to Januska how such matters were resolved by the crime families, since Januska raised a similar dispute which was then causing problems between the Bruno–Scarfo and Lucchese families. Essentially then, the court found the conversation showed the continuing nature of the overall criminal conspiracy between the two crime families.

According to Januska, when he re-entered the gambling arena in 1988, he had to obtain permission from Sodano, since Sodano was the Bruno–Scarfo member in charge of such operations in northern New Jersey. In 1988, Januska tried to re-involve the operatives he had used in his gambling operations before 1984, but he had trouble with Dominick DeLuca, also known as Dolce. Dolce told Januska he was now with the Lucchese family under Michael Perna. Perna was a member of the Lucchese family working in New Jersey under Accetturo. Dolce told Januska he would have Perna settle the matter with Januska's boss, Sodano. A few days later, Sodano called to set up the meeting of June 21, 1990.

Januska wore a recorder to the meeting with Sodano, which was attended by other crime family associates. The purpose of the meeting was for Sodano to explain to Januska how Dolce came to be "with" the Lucchese family and not the Bruno–Scarfo family. A tape recording of the conversation was played for the jury,

during which transcripts were provided along with the court's instructions that the tape was the evidence and the transcripts merely aids in listening to the evidence.

In the conversation, as explained by Januska, Sodano reviewed the resolution of the SMS conflict, an earlier example of conflict between the Bruno–Scarfo and Lucchese families, which resulted in the Storinos being "with" the Lucchese family. Sodano told how he had gone to Scarfo in 1984 and explained that "Pat and Vinnie [Storino] are good men. They're earners," meaning "they're big earners, they're big money makers, they'd be good for the family." Sodano told Scarfo that the Storino brothers had no criminal records and might be able to sell video gambling machines to the casinos, even though the Bruno–Scarfo family was earning money from the illegal Joker Poker machines being sold by SMS as well. Sodano told Scarfo that, prior to the 1984 Florida meeting, Sodano's man, Mirando, was "with these two brothers" so the Bruno–Scarfo family should get the Storinos as well.

Sodano explained that, by the time of the Florida meeting, Pat Storino had already started paying the Lucchese family $1,000 per week, and the Bruno–Scarfo family lost their claim to the Storinos' two-thirds of SMS since Timmy Murphy would not confirm that the Storinos previously had been with the Bruno–Scarfo family. At that point, Sodano admitted to Januska that he advised Pat Storino not to resist his assignment with the Lucchese family or he would get hurt. When Januska was asked, based on his conversation with Sodano, "Who did you understand Pat and Vinnie Storino to be with?" after the 1984 Florida meeting, he replied that they were with defendants' Lucchese family, leaving Mirando with the Bruno–Scarfo family.

However, Sodano reported, after getting the Storinos, the Lucchese family then began to push to get Mirando's interest and, not long before the June 1990 conversation, "this thing reached a point where it became a big problem." Sodano told Januska he had recently advised Mirando to make the best deal he could with the

Storino brothers, even if they ended up with sole ownership of the valuable boardwalk properties for less than market value, or the Lucchese family, to which the Storinos belonged, would kill Mirando and get it anyway.

The tape ran out, according to Januska, as Sodano was explaining to him that, based on how the SMS matter worked out in favor of the Lucchese family, Januska should realize that his attempt to claim Dolce was very likely to end up in favor of the Lucchese family as well. However, Januska pursued the matter by getting current crime family members to affirm that Dolce had been with Januska many years before. So, unlike the outcome when they failed to show that the Storinos had previously been with the Bruno–Scarfo family, Januska was able to claim Dolce for the Bruno–Scarfo family.

Under the co-conspirator hearsay exception, evidence is admissible against a defendant where it is "a statement made at the time the party and the declarant were participating in a plan to commit a crime or civil wrong and the statement was made in furtherance of that plan." *N.J.R.E.* 803(b)(5). This rule is "almost identical" to former *Evid. R.* 63(9)(b). Biunno, *Current N.J. Rules of Evidence,* comment 5 on *N.J.R.E.* 803(b) (1997). It is also coextensive with the federal co-conspirator hearsay exception. *See Phelps, supra,* 96 *N.J.* at 514, 476 *A.*2d 1199; *State v. Conway,* 193 *N.J.Super.* 133, 162, 472 *A.*2d 588 (App.Div.), *certif. denied,* 97 *N.J.* 650, 483 *A.*2d 174 (1984). Admission of co-conspirator statements under this exception follows only where the prosecution meets three conditions:

> First, the statement must have been made in furtherance of the conspiracy. Second, the statement must have been made during the course of the conspiracy. Lastly, our courts have held that there must be evidence, independent of the hearsay, of the existence of the conspiracy and defendant's relationship to it.
>
> [*Phelps, supra,* 96 *N.J.* at 509–10, 476 *A.*2d 1199 (citations omitted) ].

Under these principles, the inquiry is whether the making of the statements did anything in furtherance of the conspiracy.

The Taccettas do not dispute the reliability of the conversation. *See id.* at 511, 476 *A.*2d 1199 (where taped conversations are

supported by the integrity of the tapes, the reliance on its contents is justified). Instead, they claim the conversation could not be in furtherance of the conspiracy involving defendants because it concerned events which were too remote in time and since Sodano was a Lucchese rival. Essentially, these arguments rest on the premise that the conspiracy was over when the Sodano conversation took place and that the Bruno–Scarfo family was not part of the conspiracy. The arguments not only overlook the nature of the conspiracy but also well-settled grounds for admissibility of co-conspirators' statements against their cohorts.

The conspiracy here was one much greater than just the extortion of the Storinos. It encompassed a plan to control criminal enterprises in New Jersey through the dispute resolution system devised by the LCN and put in use by the Lucchese and Bruno–Scarfo families. As such, the members of the Bruno–Scarfo family, who included Sodano, were part of the entire conspiracy. Sodano was a member of the common scheme employed for resolving disputes, which in this instance included the plan to enforce the lesser conspiracy enervated and participated in by the Taccettas to extort funds from the Storinos. That Sodano's conversation was with Januska, who was working at the time for law enforcement authorities, is of no moment. "[U]ndercover agents can be co-conspirators for the purpose of proving that a conspiracy existed." *Conway, supra,* 193 *N.J.Super.* at 159–160, 472 *A.*2d 588.

We find the remoteness argument equally unavailing. It is predicated on misconceptions. Where unarrested conspirators are still capable of carrying out the ongoing conspiracy, their conversations are admissible for *N.J.R.E.* 803(b)(5) purposes. *See Conway, supra,* 193 *N.J.Super.* at 160–61, 472 *A.*2d 588 (citing *United States v. Hamilton,* 689 *F.*2d 1262, 1269 (1982), *cert. denied,* 459 *U.S.* 1117, 103 *S.Ct.* 753, 754, 74 *L.Ed.*2d 971 (1983)); *see also United States v. Haddad,* 976 *F.*2d 1088 (7th Cir.1992) (one conspirator's arrest does not necessarily terminate the conspiracy, as remaining conspirators may continue to carry out its

goals); *United States v. Ammar*, 714 *F*.2d 238, 253 (3d Cir.) (statements made even by an arrested conspirator may be in furtherance of the conspiracy), *cert. denied*, 464 *U.S.* 936, 104 *S.Ct.* 344, 78 *L. Ed.*2d 311 (1983). Therefore, in the same context of the well-settled principle that a defendant is liable for the acts of co-conspirators even though defendant lacks knowledge of those acts, the statements of co-conspirators must be admissible against a defendant when they are in furtherance of the conspiracy. Beyond that, once the prosecution demonstrates the defendant's involvement in a conspiracy, the defendant's continued involvement is presumed until the defendant proves termination or withdrawal. *United States v. Local 560 (I.B.T.)*, 974 *F.*2d 315, 338 (3d Cir.1992). A defendant withdraws from a conspiracy only when he or she acts inconsistent with the object of the conspiracy and communicates his or her withdrawal in a manner reasonably calculated to reach his or her co-conspirators. *United States v. Antar*, 53 *F.*3d 568, 582 (3d Cir.1995).

Additionally, statements relating to past events are "in furtherance" of a conspiracy where the statements serve some current purpose, such as to promote cohesiveness, provide reassurance to a co-conspirator, or prompt one not a member of the conspiracy to respond in a way that furthers the goals of the conspiracy. *United States v. Flores*, 63 *F.*3d 1342, 1377 (5th Cir.1995); *United States v. Thai*, 29 *F.*3d 785, 813–14 (2d Cir.), *cert. denied*, 513 *U.S.* 977, 115 *S.Ct.* 456, 130 *L. Ed.*2d 364 (1994); *United States v. Simmons*, 923 *F.*2d 934, 945 (2d Cir.), *cert. denied*, 500 *U.S.* 919, 111 *S.Ct.* 2018, 114 *L. Ed.*2d 104 (1991); *see also United States v. Salerno*, 868 *F.*2d 524, 537 (2d Cir.), (taped conversations between co-conspirators and an FBI agent who infiltrated a crime family were admissible to demonstrate the rules and operating practices of LCN), *cert. denied*, 491 *U.S.* 907, 109 *S.Ct.* 3192, 105 *L. Ed.*2d 700 (1989).

Applying these well-settled criteria here, there can be no dispute as to the admissibility of the recorded conversation. There is no evidence the Taccettas had withdrawn from the conspiracy at

the time of the Sodano–Januska conversation. Moreover, the taped conversation evidences that the crime families' dispute resolution criminal conspiracy was alive and well in June 1990. Sodano, an indicted co-conspirator, furthered that conspiracy.

The hearsay admitted into evidence served to demonstrate to Januska that defendants and the Lucchese crime family had been given the Storino brothers when a dispute arose with Januska's crime family, and a similar result would occur if Januska handled his dispute with defendants' crime family over Dolce in a similar manner. It furthered the criminal conspiracy of the families by educating Januska in the ways of the organization. *See Salerno, supra,* 868 *F.*2d at 536–37. By his education, Januska was able, having been advised of the appropriate procedure in the recorded conversation with Sodano, to present sufficient evidence of his entitlement to Dolce to avoid losing Dolce to defendants' family as had occurred with the Storinos. Additionally, Sodano furthered the aim of the conspiracy by making it clear that Januska refrain from making any effort to reestablish his former gambling interests in New Jersey as they might relate to the Storinos or their business enterprises.

Under these circumstances, we conclude the trial court did not err in admitting the Sodano–Januska conversation under the co-conspirator hearsay exception. Any suggestion to the contrary we find without merit.

## V.

The Taccettas further claim they were deprived of a fair trial by excesses in the prosecutor's summation. We find the claim to be without merit. *R.* 2:11–3(e)(2). We comment briefly.

A prosecutor may be forceful and graphic so long as his or her remarks are confined to fair comments on the evidence. *State v. Rose,* 112 *N.J.* 454, 518, 548 *A.*2d 1058 (1988).

Although we impose a greater burden on prosecuting attorneys than defense attorneys . . ., '[i]t is well-established that prosecuting attorneys, within reasonable

limitations, are afforded considerable leeway in making opening statements and summations.'

[*State v. DiFrisco,* 137 *N.J.* 434, 474, 645 *A.*2d 734 (1994) (quoting *State v. Williams,* 113 *N.J.* 393, 447, 550 *A.*2d 1172 (1988)) (citations omitted).]

Beyond that, "[p]rosecutorial misconduct is not ground for reversal of a criminal conviction unless the conduct was so egregious that it deprived defendant of a fair trial." *State v. Ramseur,* 106 *N.J.* 123, 322, 524 *A.*2d 188 (1987).

Applying the foregoing principles, our review of the record satisfies us the prosecutor's summation was far short of the type which could deprive a defendant of a fair trial. As the trial court noted, many of the prosecutor's comments were essentially factual. Moreover, the trial court in its jury instructions reminded the jurors that attorney summations are not evidence and they are to rely on their own recall of the testimony. The prosecutor's summation here was forceful and graphic, but it was essentially shaped to the evidence and certainly was not so egregious as to support a reversal of the convictions.

## VI.

Martin Taccetta argues the trial court erred in sentencing him for a first-degree crime on count two, the racketeering charge. His contention is that, to be a first-degree crime under *N.J.S.A.* 2C:41–3a, racketeering must reflect a pattern "which involves a crime of violence or the use of firearms" and that the predicate acts here, extortions of the Storinos, did not involve violence within the meaning of the statute. We reject the contention.

Defendant asserts that the term "crime of violence" is ambiguous and thus subject to the rule that criminal statutes are construed strictly and that ambiguities in criminal statutes are resolved in favor of the accused. *State v. Dixon,* 114 *N.J.* 111, 117, 553 *A.*2d 1 (1989).

While strict construction of penal statutes is a basic tenet of statutory construction, "[n]evertheless, the construction must con-

form to the intent of the Legislature." *State in re M.T.S.*, 129 *N.J.* 422, 431, 609 *A.*2d 1266 (1992). In *State v. Bridges*, 131 *N.J.* 402, 621 *A.*2d 1 (1993), the Court recognized the rule of strict construction but construed the phrase "term of imprisonment" based not only on strict construction but also on a careful consideration of the overall intent of the Legislature.

> The rule of strict construction, however, " 'does not prevent a court . . . from giving effect to the terms of the statute in accordance with their fair and natural acceptance.' " The " 'words of [a penal statute] are to be accorded a rational meaning in harmony with the obvious intent and purpose of the law.' "
>
> [*Id.* at 406, 621 *A.*2d 1 (citations omitted).]

The predicate crimes of which Martin Taccetta was convicted, the extortions, involved "purposely and unlawfully obtaining property of another" by "purposely" threatening "to . . . inflict bodily injury on or physically confine or restrain any one or commit any other criminal offense." *N.J.S.A.* 2C:20–5a. A rational meaning of that penal statute, given the words "threat to inflict bodily injury," demonstrates an obvious legislative intent to make extortion a crime of violence. The remaining words modifying threat cannot change that interpretation.

While no published opinion has construed the phrase "crime of violence" appearing in the RICO statute under *N.J.S.A.* 2C:41–3a, there is analogous decisional law to support the conclusion extortion is a crime of violence.

Recently, in *State v. Mejia*, 141 *N.J.* 475, 497–99, 662 *A.*2d 308 (1995), the Court, in rejecting a claim-of-right defense to robbery, explored examples in the New Jersey Code of Criminal Justice of other crimes denied the defense because they involved "thefts accompanied by violence." One of these examples was the extortion statute which, although it provides the affirmative defense of claims of right to certain thefts, does not extend to threats to " '[i]nflict bodily injury on or physically confine or restrain or commit any other criminal offense.' This limitation evinces a legislative intent to withhold a claim-of-right defense from those who threaten others." *Id.* at 499, 662 *A.*2d 308 (citation omitted).

Although *Mejia* does not directly address whether extortion is a crime of violence, the Court gave it that characterization under *N.J.S.A.* 2C:20–5a when it reviewed the reason why the Legislature distinguished an extortion conviction under that section from other types of extortion. Where property of another is obtained by threat of bodily harm, violence is the essence of the crime in the same manner as where the threat is carried out. The threat of violence is the catalyst by which the extortion is accomplished.

Here, Martin Taccetta's conviction required the State to prove he obtained either directly or indirectly, as an accomplice/co-conspirator, the property of the Storinos by the threat of violence. The threat found its effect on the Storinos by the murder of their uncle when he failed to pay tribute. The only motive for the Storinos to enrich Martin Taccetta and his crime family was a very rational fear of bodily injury or death which would result from a failure to do so. Under such circumstances, reason and common sense dictate extortion is a crime of violence. *See, e.g., United States v. DeLuca,* 17 *F.*3d 6, 8 (1st Cir.1994) (where court adopted the guidelines of the federal sentencing commission which state "that extortion, *by its nature,* should be classified as a crime of violence." (emphasis added)).

The RICO statute criminalizes the racketeering of organized crime. The statute enhances the punishment for a RICO crime of violence. There can be no dispute that intimidation, through threats of bodily injury or death, have been indigenous to crime family monetary success in securing "protection" payment exactions. It is, therefore, incomprehensible to conclude extortion by threat of violence, particularly of a nature that occurred here, is not a crime of violence under the RICO statute.

## VII.

Michael Taccetta contends the court erred in denying his request to merge his count one conviction for racketeering conspiracy into his two extortion convictions under counts five and six. We reject the contention.

At sentencing defendant contended that count one, the racketeering conspiracy, merged with counts five and six, the extortion convictions, and since they are basically in effect the same acts, the conspiracy should merge and there should not be consecutive sentences. Although Michael Taccetta argued, as he does on appeal, that the gambling aspect of the conspiracy is not enough to separately punish the conspiracy, the trial court recognized that the "fact that [the jury] found the gambling offense, it goes beyond that." The trial court held there would be no merger:

> A merger would violate not only the letter of the law, but the spirit of the law.
>
> When the legislature enacted the racketeering statute, the legislature intended that special treatment be given to persons who engaged in racketeering activity, particularly organized criminal activity. It has nothing to do with theft by extortion per se. It has to do with racketeering, running an enterprise.
>
> The defendant was convicted of conspiracy. To do that, to merge the offense of conspiracy into theft by extortion, would violate the spirit of the law. It would violate the letter of the law. It would be totally inappropriate.

The trial court rejected defendant's argument that merger was required by *State v. Hardison*, 99 *N.J.* 379, 492 *A.*2d 1009 (1985). In *Hardison*, the Supreme Court held that "if the conspiracy proven has criminal objectives other than the criminal offense proven, the offenses will not merge." *Id.* at 380, 492 *A.*2d 1009. The conspiracy to rob a hotel merged with the robbery of the hotel in *Hardison* since the conspiracy did not embrace any objective beyond the substantive offense. The opposite conclusion is warranted here since the RICO conspiracy encompassed an enterprise engaged in criminal activity far beyond the two extortions which were the predicate acts covered by the extortion in counts five and six.

When it enacted RICO, the Legislature specifically directed that "remedies provided in this act shall be cumulative with each other and other remedies at law." *N.J.S.A.* 2C:41–6.1. In *State v. Sparano*, 249 *N.J.Super.* 411, 424 n. 9, 592 *A.*2d 608 (App.Div. 1991), we noted that this statutory provision authorized a civil action for asset forfeiture under RICO in addition to a defendant's criminal sentence for a racketeering conspiracy.

In *Ball, supra,* 141 *N.J.* at 151, 661 *A.*2d 251, the Supreme Court construed several aspects of the RICO statutes but did not directly address this court's approval of separate sentences for the conspiracy and substantive offenses. The Supreme Court did hold that the conspirator need not be aware of all the objects of the conspiracy nor have knowledge of all its participants and that a RICO conspiracy conviction may rest only on the defendant's agreement that others commit the substantive offense that is the object of the conspiracy without personally committing such acts. *Id.* at 180–81, 661 *A.*2d 251.

This court held in *Ball, supra,* 268 *N.J.Super.* at 145–46, 632 *A.*2d 1222, that, consistent with federal court interpretation of federal RICO law, legislative intent in New Jersey's RICO statutes was to punish separately and by consecutive sentences a defendant convicted of both a RICO conspiracy and a predicate offense.

> The object of punishment under RICO is not the commission of the underlying predicate act, but rather the participation in an enterprise that engages in a pattern of racketeering activity. It is the enhanced danger to society posed by organized criminal activity that RICO is intended to address. The RICO crime is independent from the commission of the underlying offenses. Accordingly, it should be separately sentenced. Concurrent sentences for the RICO offense and its predicate acts would both frustrate legislative intent and give defendants the benefit of "free crimes." Therefore, the consecutive aspect of his sentence will not be disturbed.
>
> [*Id.* at 148, 632 *A.*2d 1222 (citations omitted).]

We find no basis for disagreeing with that holding or its reasoning.

### VIII.

■ Michael Taccetta also contends the trial court should have imposed concurrent and not consecutive sentences on counts five and six. We disagree.

Michael Taccetta was sentenced to an extended term for second-degree racketeering conspiracy as well as for the two extortions. He was given 20 years on count one, with 10 years each on counts five and six all to run consecutively. Martin Taccetta was

sentenced under count two for first-degree racketeering, as well as for the two extortions under counts five and six, was given life with a 25–year parole ineligibility term on count two, 10 years with 5 years of parole ineligibility on count five to be served consecutively, as well as 10 years with 5 years of parole ineligibility on count six, to be served concurrently with the term under count five.

Michael Taccetta's rationale for his concurrent sentence contention is that his brother received concurrent sentences on counts five and six. At the sentencing, the trial court anticipated and met this argument. First, the trial court found Michael eligible for an extended term as a professional criminal and persistent offender. The trial court then based its sentence on the nature and number of convictions for this career criminal, the need to protect the public, the clear risk of re-offense, lack of success in previous opportunities for rehabilitation, and the need for deterrence. At the same time, Michael was also being sentenced for convictions under separate indictments for racketeering conspiracy and theft by deception.

The trial court noted that "[s]eparate and consecutive punishments for the racketeering conspiracy and thefts by extortion are appropriate. The offense of racketeering conspiracy involves a separate and distinct evil from that of the offenses of theft by extortion." With regard to any comparison with his brother's sentence, the court stated:

> As to the extortions themselves, separate victims were involved, and in the view of what total sentence is appropriate for this defendant, consecutive sentences are indicated.
>
> By way of verbal footnote I add the following: In the case of Martin Taccetta, it is true that concurrent sentences were imposed as to Counts 5 and 6, the thefts by extortion. However, consecutive sentences could legally have been imposed as to Martin Taccetta, there having been separate victims as to the separate offenses.
>
> As noted in the reasons for sentence as to him, one of the factors, and it was an important factor in the view of the Court in having the sentences on Counts 5 and 6 served concurrently was the length of the sentence imposed upon Martin Taccetta. This factor justified some degree of leniency in the treatment of Martin Taccetta not applicable in the sentence now being imposed.
>
> . . . .

> It was in the Court's view a close question as to whether the sentences in Martin Taccetta's case should have run concurrently or consecutively.
>
> When the consideration was given to the total length of the sentence imposed upon him, the balance there tips in favor of concurrent sentences.

When a defendant is sentenced on two or more crimes at the same time, the sentences run concurrently or consecutively "as the court determines at the time of sentence." *N.J.S.A.* 2C:44–5a. Considerations in determining whether to impose concurrent or consecutive terms more significantly include whether (1) "the crimes and their objectives were predominantly independent of each other"; (2) "the crimes involved separate acts of violence or threats of violence"; (3) "the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior"; (4) "the crimes involved multiple victims"; and (5) "the convictions for which the sentences are to be imposed are numerous." *State v. Ghertler,* 114 *N.J.* 383, 391, 555 *A.*2d 553 (1989) (citing *State v. Yarbough,* 100 *N.J.* 627, 643–44, 498 *A.*2d 1239 (1985), *cert. denied,* 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986)). Moreover, consecutive sentencing is an "appropriate means to protect society from those who are unwilling to lead a productive life and resort to criminal activity in furtherance of their anti-societal lifestyle." *State v. Mosch,* 214 *N.J.Super.* 457, 464, 519 *A.*2d 937 (App.Div. 1986), *certif. denied,* 107 *N.J.* 131, 526 *A.*2d 197 (1987).

Viewed in the context of the recited principles and the Criminal Code as otherwise explicated by case law, we find no basis for disturbing the sentence imposed on Michael Taccetta. We are satisfied the sentence is neither manifestly excessive nor unduly punitive and does not represent a miscarriage of justice or shock the judicial conscience. *State v. O'Donnell,* 117 *N.J.* 210, 215–16, 564 *A.*2d 1202 (1989); *State v. Jarbath,* 114 *N.J.* 394, 401, 555 *A.*2d 559 (1989); *Ghertler, supra,* 114 *N.J.* at 387–88, 393–94, 555 *A.*2d 553; *State v. Roth,* 95 *N.J.* 334, 364–65, 471 *A.*2d 370 (1984).

## IX.

Accordingly, the judgments of conviction of Martin Taccetta and Michael Taccetta and orders for commitment are affirmed.