NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3600-13T2
             A-4230-13T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JAMES E. JONES and LIKISHA JONES,

    Defendants-Appellants,

and

GODFREY J. GIBSON,

    Defendant.

| APPROVED FOR PUBLICATION |
| :---: |
| June 15, 2016 |
| APPELLATE DIVISION |

Submitted February 24, 2016 — Decided June 15, 2016

Before Judges Alvarez, Haas, and Manahan.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 13-01-0049.

Christopher T. Campbell, attorney for appellant Likisha Jones in A-3600-13.

Joseph E. Krakora, Public Defender, attorney for appellant James E. Jones in A-4230-13 (Jason A. Coe, Assistant Deputy Public Defender, of counsel and on the briefs).

John J. Hoffman, Acting Attorney General, attorney for respondent State of New Jersey in A-3600-13 (Daniel I. Bornstein, Deputy Attorney General, of counsel and on the brief).

John J. Hoffman, Acting Attorney General, attorney for respondent State of New Jersey in A-4230-13 (Joseph A. Glyn, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

ALVAREZ, P.J.A.D.

Co-defendants Likisha Jones[1] and James E. Jones appeal[2] their convictions, contending that the five-year statute of limitations bars their prosecution. See N.J.S.A. 2C:1-6(b)(1). The matters are consolidated for decision as they involve one course of events, one indictment, and raise duplicate claims of error. Each defendant entered a guilty plea to third-degree conspiracy to hinder apprehension and/or obstruct the administration of law, N.J.S.A. 2C:5-2, 2C:29-3, and/or 2C:29-1, and third-degree hindering apprehension, N.J.S.A. 2C:29-3(a). They were sentenced on February 28, 2014, to two years' probation. The remaining counts of the indictment were dismissed as to these defendants.[3]

---

[1] We refer to members of the Jones family by their first names for the sake of clarity.

[2] Godfrey Gibson, the third co-defendant, is not involved in the appeal.

[3] Only Gibson was indicted in two counts of second-degree hindering.

Defendants contend that the Law Division judge erred in his application of the DNA exception to the statute of limitations. See N.J.S.A. 2C:1-6(c). He denied their pre-plea motion to dismiss the indictment on that basis. Although we agree with this contention, we also conclude that defendants' conduct over ten years made the conspiracy a continuing offense, and therefore the statute of limitations did not bar the prosecution of that crime.

We now reverse the denial of the motion to dismiss the indictment as to the counts which charged fourth-degree tampering with evidence, N.J.S.A. 2C:28-6(1), hindering, and fourth-degree obstruction, N.J.S.A. 2C:29-1(a). We affirm the denial of the motion, albeit for different reasons,[4] as to the conspiracy count.

Because a conspiracy to obstruct is a fourth-degree crime, the conviction also becomes a fourth-degree offense. See N.J.S.A. 2C:5-4(a). Because of this anomalous outcome, the dismissal of only one of defendants' two convictions and the reduction in the degree of the remaining offense, they have the option of withdrawing from their guilty pleas; the prosecution

_____

[4] "[A] correct result predicated upon an incorrect basis does not preclude an affirmance of [a] ruling." Velazquez v. Jiminez, 336 N.J. Super. 10, 43 (App. Div. 2000), aff'd, 172 N.J. 240 (2002).

would then proceed solely on the conspiracy count. In any event, the matter is remanded for resentencing just on the conspiracy charge.

I.

Defendants do not dispute the grim, tragic facts surrounding the death of Jon-Niece Jones detailed by the investigating officer before the grand jury on December 17, 2012.[5] His testimony essentially reiterated his interview with Iyonna Jones, the victim's sister. He also repeated information supplied by defendants. We recount those facts here.

As a result of Iyonna's disclosures and DNA testing of herself and her father, the authorities were able to identify a child's charred bones, discovered in 2005 in an isolated wooded spot near the New Jersey Turnpike. The DNA sample obtained from Jon-Niece's father was also a match; he was confirmed as the father of the victim.

Although Jon-Niece's birth was recorded, she never attended school nor received medical or dental care. Over the course of her life, her mother, Elisha Jones, neglected, physically abused, and starved her.

---

[5] The events are principally drawn from the grand jury presentment.

4

On August 14, 2002, then nine-year-old Jon-Niece was staying with her mother and then ten-year-old Iyonna at her maternal aunt Likisha's home in New York City. Sometime that day, Jon-Niece collapsed after being fed oatmeal and Elisha returned her to a bedroom.

During the night, Iyonna remembers being awakened by Elisha, who asked her for a garbage bag. Her mother then disappeared into Jon-Niece's bedroom. The following morning Elisha and Jon-Niece were gone.

Elisha left a note informing Likisha that Jon-Niece had stopped breathing and that Elisha had gone back to her home in Staten Island with the body. Iyonna remembered that after Likisha found the note, she called James to come to the apartment immediately. James is Likisha's brother, and Jon-Niece and Iyonna's uncle.

Iyonna also remembered Likisha speaking to Elisha on the phone, and that Elisha was frightened, "didn't know what to do[,]" and stated that Jon-Niece "was sitting in a bucket [and] bag, along with cement and gasoline." When Elisha said she planned to burn down the building to get rid of the body, Likisha told her to "hold off" and that "they" would go to Staten Island. Iyonna recalled that Likisha, James, and Likisha's husband Godfrey Gibson drove to Elisha's apartment.

James admitted that he was in the car when Gibson picked up Elisha, who placed a green plastic bin in the back of Gibson's vehicle. After travelling from Staten Island to a remote area in New Jersey, James helped Elisha remove the bin — which smelled of gasoline — from the car. He did not accompany her into the woods, but while he was waiting, he saw a fire behind the trees. James told the investigator that "the only thing that kept him sane this entire time was that he did not see the body."

A few days later, Likisha, Gibson, and James held a family meeting at which they directed Iyonna to say Jon-Niece was with her father if she was asked about her. Elisha died shortly after Jon-Niece, in December 2002.

Iyonna remembered arguing with Likisha approximately four years later and telling her that she was going to report Jon-Niece's death. Likisha struck Iyonna, threatening that she too would go to jail if she reported it.

When Iyonna was eighteen, James told her that Jon-Niece's body had been burned and hidden in a dark area somewhere in New Jersey. He said he had fallen asleep in the car and was unsure of the exact location, but that "they" put the body in a bucket, poured cement and water over it, and set it on fire.

Likisha's recollection was somewhat at variance with Iyonna's. Likisha remembered that after Jon-Niece died during the night, Elisha returned to her home in Staten Island. Elisha left a note saying the child had stopped breathing, that she was not coming back, and that she had used a laundry or shopping cart to remove the body. When Likisha tried to contact Elisha, she did not answer the phone.

Likisha recalled Elisha returning to the apartment in Manhattan some time later, and that she spoke to Gibson outside. Gibson, James, and Elisha took the car and were gone for several hours. The men returned without her. When Likisha next talked to her sister, Elisha told her to "stay out of her life."

After Elisha died, Likisha found another note, confirming that Jon-Niece was dead. While in the process of cleaning out Elisha's apartment, Likisha found a bag of cement and a shovel in a closet.

In 2008, James watched an "America's Most Wanted" episode titled "Baby Bones." As the program began, James phoned Likisha to turn on her television. Both were upset, as the segment was clearly about Jon-Niece. At that point, Likisha told James about the letter Elisha had left behind.

On August 23, 2012, as the investigating officer who testified before the grand jury arrived in Manhattan for his

first meeting with Gibson and Likisha, Iyonna called him. She said Gibson had just phoned and threatened to kill her if he found out that she had spoken to the police.

When initially interviewed, James denied any involvement, insisting Jon-Niece was with her father. When he eventually acknowledged that the child was dead, he said Likisha was not in the car when Jon-Niece's body was driven to New Jersey. Both he and Likisha claimed that she stayed behind to watch the other children in the home, including Iyonna.

## II.

Likisha and James's pretrial motions to dismiss the indictment were based on the five-year statute of limitations. They argued that all the statutory elements of the crimes were complete as of August 2002 and that therefore the indictment had to be dismissed.

N.J.S.A. 2C:1-6(c), the DNA exception, provides that the applicable statute of limitations

> starts to run on the day after the offense is committed, except that when the prosecution is supported by physical evidence that identifies the actor by means of DNA testing or fingerprint analysis, time does not start to run until the State is in possession of both the physical evidence and the DNA or fingerprint evidence necessary to establish the identification of the actor by means of comparison to the physical evidence.

The Law Division judge agreed with the State's position that the DNA match which identified the victim tolled the running of the statute. He expanded the scope of the exception to include "instances when the identification of a victim through DNA analysis can be used to determine the identity of a wrongdoer." Thus he opined that the statute of limitations did not begin to run until 2012, when the remains were identified and the indictment returned. The judge further observed that "both parties acknowledge[d] that the 'continuing course of conduct' exception [was] inapplicable to the alleged offenses."

Likisha's points on appeal are:

    I.    THE TRIAL COURT ERRED BY DENYING DEFENDANT'S MOTION TO DISMISS THE INDICTMENT BECAUSE THE DNA EXCEPTION TO THE STATUTE OF LIMITATIONS PURSUANT TO N.J.S.A. 2C:1-6[(c)] IS NOT APPLICABLE TO HER CASE.

        a.    The plain and unambiguous meaning of N.J.S.A. 2C:1-6[(c)] is that DNA from a suspect must match DNA evidence found at the scene.

        b.    Assuming that the DNA exception to N.J.S.A. 2C:1-6[(c)] is ambiguous or subject to multiple interpretations, the legislative history reveals intent to require a match of DNA samples from a suspect.

        c.    Assuming the statute of limitations does not require at least one DNA sample to have come from the defendant, the results of

the comparison of physical evidence to DNA evidence was not necessary to establish the identity of Likisha Jones.

II. ASSUMING THE DEFENDANT'S PROSECUTION WAS NOT BARRED BY THE STATUTE OF LIMITATIONS, THE STATE FAILED TO PRESENT A PRIMA FACIE CASE AGAINST LIKISHA JONES TO THE GRAND JURY.

James's point on appeal is:

POINT I
THIS PROSECUTION WAS BARRED BY THE STATUTE OF LIMITATIONS, AND THE DNA TOLLING PROVISION IN N.J.S.A. 2C:1-6[(c)] DOES NOT APPLY.

III.

Before any discussion of the issues, we must address the State's "concession," made in its brief to the trial judge, regarding whether any of the offenses were a continuing course of conduct that by definition would fall outside the limitations statute. For purposes of appellate review, that concession is not binding. See State v. Josey, 290 N.J. Super. 17, 32 (App. Div.) ("our judgments are precedents, and the proper administration of criminal law cannot be left merely to the stipulation of parties[.]") (quoting Young v. United States, 315 U.S. 257, 259, 62 S. Ct. 510, 511, 86 L. Ed. 832, 835 (1942)), certif. denied, 146 N.J. 497 (1996); State v. Elysee, 159 N.J. Super. 380, 384 (App. Div. 1978) ("Neither the State nor the

court is bound by a stipulation of a matter of law which is contrary to controlling law on the subject.").

                              IV.

Now turning to defendants' central argument, it is well-established that an indictment should be dismissed "only on the clearest and plainest ground," and "only when the indictment is manifestly deficient or palpably defective." State v. Hogan, 144 N.J. 216, 228-29 (1996) (quoting State v. Perry 124 N.J. 128, 168 (1991)). Although we defer to the trial court's "exercise of . . . discretionary power" in deciding whether to dismiss an indictment, State v. Warmbrun, 277 N.J. Super, 51, 60 (App. Div. 1994), certif. denied, 140 N.J. 277 (1995), such deference is not required when we are asked to review a "trial court's interpretation of the law and the legal consequences that flow from established facts[,]" Manalapan Realty, L.P. v. Twp. Comm., 140 N.J. 366, 378 (1995). An indictment returned after the expiration of the five-year statute of limitations would clearly be "manifestly deficient or palpably defective."

The statute of limitations in a criminal case is "an absolute bar to the prosecution of the offense." State v. Cagno, 211 N.J. 488, 506 (2012) (quoting State v. Short, 131 N.J. 47, 55 (1993)), cert. denied, ___ U.S. ___, 133 S. Ct. 877, 184 L. Ed. 2d 687 (2013). It is designed to protect a defendant

"from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost." Chase Sec. Corp. v. Donaldson, 325 U.S. 304, 314, 65 S. Ct. 1137, 1142, 89 L. Ed. 1628, 1635 (1945); see also State v. Diorio, 216 N.J. 598, 612 (2014) (statutes of limitations "protect individuals from charges when the basic facts have become obscured by time.").

On appeal, as they did in the Law Division, Likisha and James contend the five-year limitation mandates dismissal of the indictment because the DNA exception applies only to those cases in which DNA matches the "actor." In contrast, in this case, DNA from family members matched the victim. Nothing about those results inherently suggested the identity of the perpetrators whose conduct led to the child's death, or the destruction of her remains.

Certainly the DNA comparison identified Jon-Niece, corroborated Iyonna's story, and in those important respects advanced the prosecution. But the language in the statute creating an exception for DNA evidence does not encompass its use in order to identify persons other than the actor, even if the match may ultimately lead investigators to the perpetrator of the crime. The dispositive question is whether the DNA evidence itself identifies the perpetrator.

"[W]hen the prosecution is supported by physical evidence that identifies the actor by means of DNA testing . . . time does not start to run until the State is in possession of both the physical evidence and the DNA . . . necessary to establish the identification of the actor by means of comparison to the physical evidence." N.J.S.A. 2C:1-6(c). Any grammatical, logical construction of this language leads inescapably to the conclusion that the DNA in question must be that of the person or persons who committed the offense. See State v. Rangel, 213 N.J. 500, 509 (2013) (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)) (statutory interpretation requires "looking at the statute's plain language, giving words 'their ordinary meaning and significance.'"). The statute employs the term "actor" to mean the perpetrator of the crime. State v. Twiggs, ___ N.J. Super. ___, ___ (App. Div. 2016) (slip op. at 9).

In Twiggs, Gary Twiggs and Dillon Tracy were charged with an armed robbery committed on June 16, 2009. Id. at 2-3. Despite DNA material having been timely sent to the State Police laboratory for analysis, no match was found until July 2, 2014, and it identified Tracy, but not Twiggs. Tracy later implicated Twiggs in the crime. Id. at 3-4. On December 2, 2014, both men were indicted, months after the statute of limitations had run.

In *Twiggs*, we observed that were the prosecution to go forward based solely on the confession of another, it "would [] override the entire limitations period for any party accused of a crime when any single defendant [directly identified through DNA] names another party in a confession." *Id.* at 10. Unlike when a perpetrator is identified by DNA evidence, a prosecution based solely on the word of another who is identified by DNA raises the precise jeopardy the statute is intended to avoid: the difficulties in mounting a defense "when the basic facts have become obscured by time." *See* *Diorio*, *supra*, 216 *N.J.* at 612.

Similarly, the use of DNA taken from innocent family members to identify the victim does not distinguish the case from one in which, years after a crime, a person who had previously remained silent decides to come forward and make an accusation. In this case, only non-DNA, purely circumstantial evidence establishes the identity of the perpetrators. Therefore, there is no meaningful distinction between this case and any other in which disclosures are made after the statute has expired that point the finger at an alleged perpetrator. To suggest a distinction exists would eliminate in one stroke the protection found in the statute of limitations. The use of a

DNA match to someone other than the perpetrator does not come within the exception.

## V.

Next we consider whether the indictment survives under a "continuing offense" analysis, assessing each count in turn. Our Supreme Court has recently reiterated the distinction between crimes that can be classified "as either a discrete act or a continuing offense." Diorio, supra, 216 N.J. at 614. "'A discrete act' is one that occurs at a single point in time . . . . A continuing offense involves conduct spanning an extended period of time and generates harm that continues uninterrupted until the course of conduct ceases." Ibid. The New Jersey Code of Criminal Justice includes a presumption against continuous offenses; however, that presumption is overcome if the statute defining the offense includes conduct which persists over time. Id. at 615-16. If the scheme that constitutes the offense is one which "play[s] out over the course of many days, weeks, months, or even years[,]" then it is a course of conduct. See id. at 618. The statute of limitations is tolled until the time the last act occurs in the series of events constituting the scheme. Id. at 613. The statute of limitations applies, obviously, if the continuing offense exception does not.

Likisha and James were charged with fourth-degree tampering with physical evidence. See N.J.S.A. 2C:28-6. The indictment alleges the offense occurred when defendants removed "the deceased body of Jon-Niece Jones with purpose to impair its verity or availability in . . . [an] investigation[.]" The indictment tracks the statute which reads:

> A person commits a crime of the fourth degree if, believing that an official proceeding or an investigation is pending or about to be instituted, he:
>
> (1) Alters, destroys, conceals or removed any article, object . . . or other thing of physical substance with purpose to impair its verity or availability in such proceeding or investigation. . . .
>
> [N.J.S.A. 2C:28-6(1).]

The offense of tampering falls within the category of a discrete offense. Defendants, "at a single point in time[,]" assisted Elisha in destroying and concealing Jon-Niece's body. See Diorio, supra, 216 N.J. at 614.

The statutory language defining the offense indicates that the crime is the conduct necessary to destroy or conceal a physical item so as to "impair" a prosecution. In this case, after driving Elisha and her daughter's body to New Jersey, nothing further was required. The elements of N.J.S.A. 2C:28-6(1) were completed in 2002. Because the crime occurred

16                                                    A-3600-13T2

more than five years prior, the charge should have been dismissed pursuant to the statute of limitations.

Defendants were also charged with hindering in that they attempted to suppress the investigation, including by tampering with a witness, Iyonna, "which might aid in the discovery or apprehension of Elisha Jones or in the lodging of a charge against her." N.J.S.A. 2C:29-3(a) provides that "[a] person commits an offense if, with purpose to hinder the . . . prosecution of another for an offense[,]" he or she tampers with a witness. Elisha died in December 2002. Since no prosecution against Elisha could proceed after her death, that element of the statute could not be met and this charge should have also been dismissed.

In the indictment, the State alleged that defendants obstructed the administration of law by their intimidation of Iyonna. The obstruction statute states:

> a. A person commits an offense if he purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act.
>
> [N.J.S.A. 2C:29-1(a).]

A-3600-13T2

The first act of obstruction occurred in 2002 shortly after Jon-Niece's death, when the adults told Iyonna to lie if she were asked about her sister's whereabouts. Likisha arguably committed a second act of obstruction in 2006, when Iyonna was fourteen, when she again threatened her in order to keep her quiet. James did nothing further after 2002.

Although Iyonna continued to be "intimidated," and in that sense the harm continued, neither of these defendants took action after 2006. Therefore the obstruction charges must also be dismissed as barred by the five-year limitation term. The focus under the obstruction statute is the conduct engaged in by the actor, not merely the effect.

## VI.

Finally, we turn to the charge of conspiracy. A person is guilty of conspiracy if, with the purpose of "promoting or facilitating its commission," he or she agrees with others to engage in a crime, or agrees to aid in the planning, attempt, or solicitation to commit a crime. N.J.S.A. 2C:5-2(a).

Conspiracy is "a continuing course of conduct which terminates when the crime or crimes which are its object are committed or the agreement that they be committed is abandoned by the defendant and by those with whom he conspired[.]" N.J.S.A. 2C:5-2(f)(1). "If the conspiracy is one that

contemplates a continuity of purpose and a continued performance of acts, it can be inferred to exist until there has been an affirmative showing that it has terminated." Cannel, <u>New Jersey Criminal Code Annotated</u>, comment 12 on <u>N.J.S.A.</u> 2C:5-2 (2015-2016) (citing <u>State v. Cagno</u>, 211 <u>N.J.</u> 488, 511-12 (2012)); <u>see also</u> <u>State v. Savage</u>, 172 <u>N.J.</u> 374, 403 (2002) ("a conspiracy may continue beyond the actual commission of the object of the conspiracy if it is shown that a conspirator enlisted false alibi witnesses, concealed weapons, or fled in order to avoid apprehension.").

In <u>State v. Taccetta</u>, in deciding whether <u>N.J.R.E.</u> 803(b)(5) authorized the admission of a co-conspirator's statement, we said that just as "a defendant is liable for the acts of co-conspirators even though defendant lacks knowledge of those acts, the statements of co-conspirators must be admissible against a defendant when they are in furtherance of the conspiracy." 301 <u>N.J. Super.</u> 227, 253 (App. Div.), <u>certif. denied</u>, 152 <u>N.J.</u> 187, 152 <u>N.J.</u> 188 (1997). Additionally, "once the prosecution demonstrated the defendant's involvement in a conspiracy, the defendant's continued involvement is presumed until the defendant proves termination or withdrawal." <u>Ibid.</u> This includes statements relating to past events where necessary to "prompt one not a member of the conspiracy to respond in a

way that furthers the goals of the conspiracy." Ibid. (citing United States v. Flores, 63 F.3d 1342, 1377 (5th Cir. 1995)).

Therefore, as to the conspiracy, because the statute and caselaw define it as a continuing offense, the question we must answer is "when the last act . . . occurred." Diorio, supra, 216 N.J. at 613.

In relevant part, the indictment alleged that defendants unlawfully agreed to commit the crimes "of . . . [o]bstructing the [a]dministration of [l]aw[.]" The overt acts specified in the indictment, however, focused on the tampering and hindering conduct: the transportation of Jon-Niece's body from New York to New Jersey, the destruction of her body, and the concealment of her remains "in a secluded area nearby the New Jersey Turnpike[.]"

But "the State may prove overt acts other than those alleged in the indictment." State v. Klausner, 4 N.J. Super. 427, 431 (App. Div.) (citing State v. Ellenstein, 121 N.J.L. 304, 317 (Sup. Ct. 1938)), certif. denied, 3 N.J. 378 (1949); see also United States v. Schurr, 794 F.2d 903, 907 n.4 (3rd Cir. 1986) ("There would appear to be no reason that the government could not satisfy its requisite showing under the statute of limitations by means of an overt act not listed in the indictment."); United States v. Norris, 753 F. Supp. 2d 492,

519 (E.D. Pa. 2010) (alteration in original) ("It is well settled that the government can prove overt acts not listed in the indictment, so long as there is no prejudice to the defendants thereby.") Pursuant to N.J.S.A. 2C:5-2(d), overt acts keep a conspiracy alive so long as committed "by a person with whom [the person charged] conspired."

With the exception of the 1938 Ellenstein decision, the cases we have cited above regarding the specification of overt acts in an indictment consider the issue in the context of conviction after trial rather than a motion for dismissal; nonetheless, they provide guidance. That a jury may convict on overt acts omitted from an indictment lends authority to the notion that the State can withstand a motion to dismiss where other overt acts may be proven that are not found in the charging document itself.

The conspiracy count does not specifically identify the 2006 and 2012 threats as overt acts. Yet the grand jury found the conspiracy extended beyond Gibson's 2012 threats, thus putting defendants on notice of the timeframe they were expected to defend and the conduct. They were not prejudiced at that stage by the State's failure to allege the overt acts in question. Additionally, a defendant facing an indictment which he considers "not sufficiently specific to enable [him] to

prepare a defense[]" has the right to move for a bill of particulars pursuant to Rule 3:7-5.

Thus the overt acts which made this a continuing conspiracy which obscured the crimes they committed by helping Elisha in 2002 when Jon-Niece died include: the family meeting in 2002 and the direction to Iyonna to lie if asked about the child's whereabouts, Likisha's 2006 threats, James's discussion with Iyonna in 2010 when he described the events,[6] and Gibson's threats.

James did not initially repudiate or abandon the conspiracy. At first, he told investigators that Jon-Niece was with her father, the explanation the parties agreed to ten years before. This knowing misstatement of fact was also intended to continue the conspiracy of silence which did not actually end until, when pressed by the authorities, Likisha and James finally admitted their involvement. See Cannel, New Jersey Criminal Code Annotated, comment 12 on N.J.S.A. 2C:5-2 (2015-2016) ("If the conspiracy is one that contemplates a continuity of purpose and a continued performance of acts, it can be

_____

[6] We include this conversation, no doubt troubling to Iyonna, because it would have prompted her to continue to lie and keep quiet about her family's complicity although not a direct threat. See Taccetta, supra, 301 N.J. Super. at 253.

inferred to exist until there has been an affirmative showing that it has terminated.").

So long as the co-conspirators kept quiet, and successfully kept Iyonna from making any disclosures, everyone's wrongdoing was hidden. Theirs was a continuing course of conduct, a true conspiracy of silence that began in 2002, was reaffirmed over the years, and did not stop until Likisha and James confessed. Hence the last act occurred the year of the indictment. The five-year statute of limitations does not compel dismissal of this charge. It was not "manifestly deficient or palpably defective[.]" Hogan, supra, 144 N.J. at 228-29 (quoting Perry, supra, 124 N.J. at 168).

VII.

Likisha separately contends that the State failed to establish a prima facie case against her before the grand jury. This contention lacks merit given Likisha's pivotal role in orchestrating the conspiracy the officer described during his testimony before the grand jury.

Even if Likisha did not travel to New Jersey in 2002, she participated in the family meeting afterwards when Iyonna was told to lie about Jon-Niece's whereabouts. She threatened Iyonna in 2006 that she too would be jailed if she made any disclosures to the authorities. Hence, the grand jury was

presented with enough circumstances to demonstrate a prima facie case of conspiracy to obstruct.

## VIII.

We affirm denial of the motion to dismiss the conspiracy count and vacate the guilty pleas to the hindering charge. Other than the conspiracy count, the motion to dismiss the indictment as beyond the statute of limitations should have been granted. Defendants may withdraw from their guilty pleas should they wish to do so, and the prosecution move forward solely on the charges of conspiracy. Should defendants elect to adhere to the earlier agreement, they should be resentenced on the fourth-degree conspiracy.

Affirmed in part; reversed in part.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3600-13T2