**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0088-18T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

BRADLEY C. THOMPSON,
a/k/a BRAD THOMPSON and
BARTON C. THOMPSON,

    Defendant-Appellant.

_____

> Submitted November 18, 2020 – Decided  December 18, 2020
>
> Before Judges Whipple, Rose and Firko.
>
> On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 17-05-1263.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Stephen W. Kirsch, Designated Counsel, on the brief).
>
> Gurbir S. Grewal, Attorney General, attorney for respondent (Lauren Bonfiglio, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant Bradley C. Thompson appeals from a June 5, 2018 judgment of conviction for criminal sexual contact and criminal trespass. We affirm.

I.

The following facts are derived from the record. On July 21, 2001, C.S.,[1] a twenty-seven-year-old mother, returned to her home in Lindenwold at 10:30 p.m. after grocery shopping. She resided there with her four-month-old son, her mother, and her sister. C.S.'s mother and sister were out of town on vacation. As C.S. unloaded her car, she heard "whistling" and "talking sounds" coming from the left side of the house. She took care of her child and began eating dinner in front of the television.

Shortly thereafter, C.S. "heard something behind [her]," and someone covered her eyes with one hand and grabbed her by the neck with an arm. The intruder (defendant) pulled C.S. off the chair by her neck and hair and dragged her to the first-floor bathroom. C.S. physically struggled with the intruder and repeatedly said "no," but he was "very, very strong" and she was unable to free herself from his tight grip around her throat.

C.S. was thrown on the floor and a towel was placed over her head to cover her eyes, making it impossible for her to see the intruder because it was

---

[1] We use initials to protect the victim's identity pursuant to Rule 1:38-3(c)(12).

dark. She stopped resisting out of fear and concern what would happen next. While lying on the floor face down on her stomach, the intruder tried to remove C.S.'s bra but did not know how to unhook it. He asked her to unhook it but she refused. Ultimately, he removed her bra by pulling it over her head as she continued to resist him and told him to leave her baby alone. He then removed her clothes and used his hands and mouth to touch and lick her breasts. He then used his fingers and stomach to touch C.S.'s genital area and forced her to perform oral sex on him by placing his penis in her mouth.

During the assault the intruder told C.S., "I really want you," and she testified his voice sounded "very young"—between fifteen and twenty years of age.[2] The intruder did not ejaculate during the assault. C.S. also estimated his height to be five-feet, six inches, or five-feet, seven inches based upon the feel of his body in comparison to her four-foot, eleven-inch height.

The intruder then asked C.S. where her bedroom was, but she refused to answer. He stated he had to take a shower, leading C.S. to believe he lived nearby. The perpetrator left after telling C.S., "[c]ount to ten. Don't call the cops." C.S. was "terrified" and felt "violated."

---

[2] Defendant was fifteen years old at the time.

C.S. immediately called her mother, and when she did not answer, C.S. called a close family friend who lived five minutes away. The police were called and came to C.S.'s home. Upon entering the home, the first responding officer found C.S. sitting in a chair, "extremely upset," with scissors in her hands, "crying as if something had just occurred." C.S. told the officer the perpetrator's voice sounded like a teenager, and during the assault he said, "I've been wanting you." After C.S. explained to the officer what happened, she and her mother[3] were transported to the hospital for C.S. to undergo a Sexual Assault Nurse Examiner (SANE) examination.

The SANE nurse noted C.S. had "an abrasion on one ankle." C.S. did not report having any pain. The SANE nurse also collected samples from C.S., including a swab of dried saliva from her right breast. The samples were given to police officers for transport to the New Jersey State Police Office of Forensic Sciences in accordance with chain of custody protocol.

Thereafter, officers escorted C.S. back to her home and evaluated the area. They noticed a chair that had been moved from the patio area and placed under the bathroom window. C.S. confirmed that neither she nor her mother moved

---

[3] Upon learning what happened to her daughter, C.S.'s mother immediately drove back from where she was vacationing to the house.

the chair. Neighborhood canvassing and interviews did not yield any leads. A patrolman spoke to defendant's father, who lived across the street from C.S., but the conversation did not produce any helpful information. Two days after the attack, C.S. gave a tape-recorded statement to police. When asked if she knew any teenagers in the neighborhood, C.S. responded she knew a teenager lived across the street, but her only interaction with him occurred when she was pregnant, and he advised her car lights were still on after she parked her car. C.S. also stated the teenage boy's father's name was "Frank," but she did not know the teenager personally.

On January 23, 2002, the forensic laboratory issued a report with respect to the samples collected during the SANE examination. A DNA profile was generated from the sample collected from C.S.'s right breast, designated as Specimen 12A, and she was excluded as a possible contributor to that profile. The profile was then entered into the State's CODIS.[4]

---

[4] CODIS stands for "Combined DNA Index System." Our Supreme Court, in a footnote, approvingly cited our definition of CODIS: "'CODIS' means the [Federal Bureau of Investigation]'s national DNA identification index system that allows the storage and exchange of DNA records submitted by State and local forensic laboratories." N.J.S.A. 53:1-20.19; see also State v. Gathers, 449 N.J. Super. 265, 268 n.1 (App. Div. 2017) ("CODIS refers to the Combined DNA Index System maintained in all fifty states and a number of federal agencies to collect DNA profiles to be used for, among other things, human identity testing.") State v. Gathers, 234 N.J. 208, 214 n.1 (2018).

On January 29, 2004, the Juvenile Justice Commission obtained a buccal swab from defendant on an unrelated charge. However, defendant's buccal swab was not entered into CODIS until April 2006 due to a significant processing backlog. CODIS did not generate a match of defendant's sample to Specimen 12A obtained from C.S. by the SANE nurse.

In 2014, the New Jersey State Police DNA Laboratory underwent a self-audit of CODIS entries and revised their data entry procedures.[5] As a result of the audit, the laboratory began inputting exclusionary data from samples previously omitted. The audit remained ongoing in 2016 when an analyst from the laboratory performing a quality control check noticed that only five loci[6] in the DNA profile of Specimen 12A had been entered into CODIS. Because at least seven loci in the DNA profile were required to generate a match, the analyst entered the exclusionary data from Specimen 12A's profile to see if CODIS would generate an investigative lead.

---

[5] Prior to the audit, certain exclusionary data, specifically refractory peaks below the standardized reporting threshold, were not entered into CODIS because they were considered inconclusive.

[6] The National Human Genome Research Institute defines locus as "the specific location of a gene or other DNA sequence on a chromosome."

A-0088-18T4

CODIS did generate an investigative lead implicating defendant, and police obtained a voluntary buccal swab from him. The second buccal swab was sent to the laboratory for comparison, and on August 17, 2016, the laboratory generated a report matching the DNA profile from the second buccal swab to the DNA profile obtained from Specimen 12A. Defendant was arrested on the basis of the DNA match.

In May 2017, a Camden County grand jury returned Indictment Number 17-04-1263, charging defendant with three counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(3) (counts one through three); three counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(6) (counts four through six); two counts of third-degree aggravated sexual contact, N.J.S.A. 2C:14-3(a) (counts seven and eight); and second-degree burglary, N.J.S.A. 2C:18-2(a)(1) (count nine).

On December 15, 2017, defendant moved to dismiss counts one through three and counts seven through nine of the indictment based on statute of limitations grounds. The trial court conducted a testimonial hearing, entertained oral argument, and denied defendant's motion. Defendant moved for leave to appeal the trial court's decision. On January 29, 2018, the trial court denied defendant's motion for leave to appeal.

7

Defendant was tried before a jury in April and May of 2018. On April 25, 2018, the trial court granted defendant's motion for a judgment of acquittal on counts four, five, six, and eight based on a finding of insufficient evidence of severe personal injury to the victim. On May 3, 2018, the jury rendered a verdict of not guilty on counts one through three but found defendant guilty of fourth-degree criminal sexual contact, a lesser-included offense of count seven, and fourth-degree criminal trespass, a lesser-included offense of count nine.

On May 31, 2018, the court sentenced defendant to eighteen months' imprisonment, with nine months' of parole ineligibility for the lesser-included count seven offense and imposed a consecutive fifteen-month term of imprisonment with no parole eligibility on the lesser-included count nine offense. This appeal followed.

On appeal, defendant raises the following arguments:

POINT I

THE COURT IMPROPERLY DENIED THE MOTION TO DISMISS COUNTS SEVEN AND NINE THAT WAS BASED UPON A VIOLATION OF THE STATUTE OF LIMITATIONIS.

POINT II

THE SENTENCE IMPOSED IS MANIFESTLY EXCESSIVE.

## II.

We apply a plenary standard of review to the trial court's decision on a motion to dismiss, and we owe no deference to the trial court's conclusions. Gonzalez v. State Apportionment Comm'n, 428 N.J. Super. 333, 349 (App. Div. 2012). Further, de novo review is also applied because the motion to dismiss involves statutory construction, State v. Ferguson, 238 N.J. 78, 93 (2019) (applying the de novo standard of review where "[t]he outcome of [the] case depends on the meaning of . . . a statute governing territorial jurisdiction - - and on the territorial scope of [a] . . . statute"); Paff v. Galloway Twp., 229 N.J. 340, 351 (2017) (applying de novo review and declining to give deference to the interpretative conclusions of the trial court), and "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995).

On appeal, defendant contends that since the State was in possession of all the DNA necessary to generate a match between defendant and Specimen 12A in 2004, the statute of limitations bars prosecution of the offenses arising out of this incident pursuant to N.J.S.A. 2C:1-6(c). We disagree.

Generally, under N.J.S.A. 2C:1-6(b)(11), a defendant's prosecution must be "commenced within five years after it [was] committed." N.J.S.A. 2C:1-6(c) provides that time, for purposes of calculating when the statute of limitations of criminal prosecutions

> starts to run on the day after the offense is committed, except that when the prosecution is supported by physical evidence that identifies the actor by means of DNA testing or fingerprint analysis, time does not start to run until the State is in possession of both the physical evidence and the DNA or fingerprint evidence necessary to establish the identification of the actor by means of comparison to the physical evidence.

Here, the competent, credible evidence before the trial court established that the State was first in possession of the identifying physical evidence necessary to identify defendant contemplated by N.J.S.A. 2C:1-6(c) on August 17, 2016, the date when "the State obtained the conclusive match between defendant's DNA profile and the DNA profile obtained from Specimen 12A." Thus, the time commenced, for purposes of prosecuting defendant, at that time—August 17, 2016.

Defendant's claim to the contrary is unsupported by the law and the record. Courts analyzing a statute must give effect to the Legislature's intent. Johnson Mach. Co. v. Manville Sales Corp., 248 N.J. Super. 285, 303-04 (App. Div. 1991). The Legislature's intent is evidenced by the "language of [the] statute,

the policy behind it, concepts of reasonableness[,] and legislative history."  Id.

at 304.  Because the "best indicator" of the Legislature's intent is "the statutory

language," courts should "ascribe to the statutory words their ordinary meaning

and significance and read them in context with related provisions so as to give

sense to the legislation as a whole."  DiProspero v. Penn, 183 N.J. 477, 492

(2005).

Generally, under the applicable statute, prosecution for a criminal offense

must be commenced[7] within five years after the crime is committed.  N.J.S.A.

2C:1-6(b)(1).  The Code states that a crime or offense is committed "either when

every element occurs or, if a legislative purpose to prohibit a continuing course

of conduct plainly appears, at the time when the course of conduct or the

defendant's complicity therein is terminated."  N.J.S.A. 2C:1-6(c).  An exception

to this general rule is made when "the prosecution is supported by physical

evidence that identifies the actor by means of DNA testing or fingerprint

analysis."  Ibid.  The exception states the clock on the statute of limitations does

not begin to "run until the State is in possession of both the physical evidence

---

[7] N.J.S.A. 2C:1-6(d) provides that "[a] prosecution is commenced for a crime when an indictment is found and for a nonindictable offense when a warrant or other process is issued, provided that such warrant or process is executed without unreasonable delay."

and the DNA or fingerprint evidence necessary to establish the identification of the actor by means of comparison to the physical evidence." Ibid.

During oral argument in support of defendant's motion to dismiss, defense counsel emphasized the "in possession of" language set forth in N.J.S.A. 2C:1-6(b)(1) and argued defendant's arrest and indictment came more than five years after the State obtained defendant's DNA in 2004; the State entered defendant's DNA sample into CODIS in 2006; and the 2010 publication of the National CODIS Manual, which stated exclusionary data from a DNA sample could be entered into the system. The trial judge rejected these arguments:

> Now, a literal reading of this statute, the question is what was necessary for the State to establish the identification of this defendant to the specimen that [it] had in [its] possession.
>
> . . . .
>
> In taking a literal reading of the statute that talks about evidence necessary to establish the identification of the actor, a literal reading of the comments that falls behind [N.J.S.A.] 2C:1-6([c]) and the comments read . . . as a result of the 2001 amendment, if the prosecution is supported by DNA or fingerprint evidence, the time period does not begin to run until the prosecution gets that evidence, not only the samples, but the evidence of a match. That's in the New Jersey Court Rule book.

A-0088-18T4

On appeal, defendant contends the trial judge committed error[8] by relying on an unofficial code commentary to the court rules.  Additionally, defendant seeks to support his "in possession" reading of the statute with our Supreme Court's decision in the case of State v. Twiggs, 233 N.J. 513 (2018).  Defendant interprets Twiggs as starting "the running of the limitations clock when the State has in its possession the DNA of the defendant and DNA from the crime scene that is ultimately matched with defendant's." (citing Twiggs, 233 N.J. at 536-39).

The Court in Twiggs interpreted N.J.S.A. 2C:1-6(c), but the underlying case and resultant decision focused on a different aspect of the statute.  Twiggs involved a consolidated appeal[9] that sought to address the meaning of the term "actor" in the provision and "whether the provision applies when a DNA

---

[8]  Defendant acknowledges in his brief that the proper standard of review for this purely legal issue is de novo.

[9]  The first case on appeal, State v. Twiggs, 445 N.J. Super. 23 (App. Div. 2016), involved two individuals, Twiggs and Tracy, charged with conspiracy to commit robbery and robbery.  Twiggs, 233 N.J. at 522.  DNA recovered from the scene of the robbery was matched to Tracy who confessed and implicated Twiggs in the crime.  Ibid.  The trial court dismissed Twiggs's indictment because the DNA evidence identified an alleged co-conspirator, not the defendant.  Ibid.  The second case on appeal, State v. Jones, 445 N.J. Super. 555 (App. Div. 2016), involved the use of comparison DNA from the victim and her sister to aid the prosecution of two individuals for the victim's murder.

13

identification does not directly identify the defendant but rather begins an investigative chain that leads to the defendant." Id. at 520. The Court concluded "the DNA-tolling exception applies only when the State obtains DNA evidence that directly matches the defendant to physical evidence of a crime," and held that "[b]ecause the DNA identifications at issue in these cases did not directly link defendants to the relevant offenses," the dismissal of the indictments in both underlying cases should be affirmed. Ibid.

The facts and legal issues analyzed in Twiggs are distinguishable from those presented in this appeal. Moreover, defendant's argument relies on Twiggs' dicta, not its holding. Before reaching its conclusion, the Twiggs' Court cited to legislative history:

> In 2002, the Senate and General Assembly amended N.J.S.A. 2C:1–6 to include the DNA exception. L. 2001, c. 308, § 1(c) (effective Jan. 3, 2002). During its drafting phase, the initial bill used the phrases "the person who commits a crime" and "the person who committed the crime" instead of "the actor." S. 1516/A. 2658 (2000). The Sponsors' Statement accompanying that draft stated: "[t]his bill would remove the time limitations on the prosecution of crimes when the person who committed the crime is unknown at the time, but DNA evidence collected at the crime scene can be used to identify the person at a later date." Sponsors' Statement to S. 1516 (Sept. 14, 2000); Sponsors' Statement to A. 2658 (June 29, 2000). The Legislature noted the purpose behind the criminal statutes of limitations is "to protect defendants from the

14 <span>A-0088-18T4</span>

use of 'stale' evidence against them," but pointedly distinguished "properly collected[,] . . . handled and stored" DNA evidence because it "can reliably identify defendants many years after a crime has been committed." Ibid.

The final-adopted bill's Sponsors' Statement provides that the DNA exception "would toll the applicable statute of limitations for the commission of a crime in certain cases until the State is in possession of DNA evidence taken from the suspect." Sponsors' Statement to S. 1516 (Jan. 3, 2002) (emphasis added). In the final bill's legislative fiscal analysis, the Legislature further explained: "[p]resently, certain guilty persons may avoid standing trial in cases where DNA . . . evidence is received that would establish their identities after the statute of limitations for a particular crime has expired." Legis. Fiscal Estimate to S. 1516 (Jan. 22, 2002) (emphasis added).

[Twiggs, 233 N.J. at 536-37).]

Defendant cites this legislative history in support of his argument that "possession of the relevant forensic evidence is what triggers the running of the statute, not the State's later proper matching of that evidence." However, defendant's position ignores the remainder of the sentence which points out that the evidence must be sufficient to establish a suspect's identity. See, e.g., Legis. Fiscal Estimate to S. 1516 (Jan. 22, 2002) ("Presently, certain guilty persons may avoid standing trial in cases where DNA . . . evidence is received that would

establish their identities after the statute of limitations for a particular crime has expired)." (emphasis added).

Saliently, a plain reading of the statute itself also shows that the emphasis is not on when the State gained possession of the samples, but when the State obtained the data necessary for the State to establish the identification of this defendant to the specimen that it had in its possession. N.J.S.A. 2C:1-6(c) ("[T]ime does not start to run until the State is in possession of both the physical evidence and the DNA or fingerprint evidence necessary to establish the identification of the actor by means of comparison to the physical evidence.") (emphasis added). Based upon the plain language of N.J.S.A. 2C:1-6(c), we conclude the trial court correctly determined the statute of limitations did not begin to run until the State matched Specimen 12A to defendant's DNA sample on August 17, 2016.

We also reject defendant's claim that he was prejudiced by being prosecuted beyond the statute of limitations period. In criminal cases, the statute of limitations serves as an absolute bar to prosecution of the crime or offense. State v. Short, 131 N.J. 47, 55 (1993). The purpose of the absolute bar is "to protect a defendant 'from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost.'" State v. Jones,

445 N.J. Super. 555, 566 (App. Div. 2016), aff'd, 233 N.J. 513 (2018) (quoting Chase Sec. Corp. v. Donaldson, 325 U.S. 304, 314 (1945)). "Our law recognizes a criminal defendant's right 'to a prompt prosecution,' stemming from the potential prejudice likely to result 'when the basic facts have become obscured by time.'" Twiggs, 233 N.J. at 533 (quoting State v. Diorio, 216 N.J. 598, 612 (2014)). Therefore, any exception to the general statute of limitations rule must be construed narrowly. See In re Expungement Application of P.A.F., 176 N.J. 218, 223 (2003) (stating exceptions to general rules "are to be construed narrowly").

Our Supreme Court and Legislature have both underscored the importance of protecting defendants from the use of stale evidence against them. See, e.g., Twiggs, 233 N.J. at 539 ("Outside of the limitations period, a defendant faces a diminished ability to find alibi witnesses and evidence to defend against basic facts [that] have become obscured by time.") (internal citation omitted); Sponsors' Statement to S. 1516 (Mar. 9, 2001) ("The traditional rationale for these statutes is to protect defendants from the use of 'stale' evidence against them."). However, DNA has been widely acknowledged as uniquely reliable evidence that does not become stale. See, e.g., Twiggs, 233 N.J. at 539 ("Unlike other forms of evidence, DNA evidence can never become stale."); Sponsors'

17

<u>Statement to S. 1516</u> (Mar. 9, 2001) ("DNA evidence . . . can reliably identify defendants many years after a crime has been committed.")

While the backlog and delays in processing the DNA samples in this case occurred over the course of several years, this type of delay was expressly contemplated by the legislative sponsors of N.J.S.A. 2C:1-6(c):

> The number of DNA profiles of criminals and suspects stored in state and federal DNA databanks is growing rapidly. This increase has overwhelmed crime labs and caused significant backlogs in the analysis of DNA evidence. This has resulted in cases where prosecuting authorities have matched DNA evidence with a DNA profile, but have been barred from bringing charges against the suspect on the grounds that the statute of limitation[s] on the crime has expired. Under the bill, authorities would not be barred from prosecuting such crimes in this State.
>
> [(<u>Sponsors' Statement to S. 1516</u> (Mar. 9, 2001).]

Further, as the trial court poignantly noted in its supplemental reasoning in denying defendant's motion to dismiss:

> And I find that in this case under these particular specific facts, I find that the time did not toll as no comparison was made until the New Jersey State Police protocols and guidelines were changed in 2015 to mirror the National DNA Index System.
>
>          . . . .
>
> The rules changed as [the] science change[d]. I note that science is forever changing and improving its

18

ability to identify potential assailants. It would appear that this comment that followed in the Criminal Code foresaw the abilities of science, and science changing.

Here, the State laboratory was in possession of both pieces of DNA evidence in 2004, but the data entered into CODIS was insufficient to generate a match until the exclusionary data was entered in 2016. The intervening change in procedure that precipitated the match between defendant's DNA and Specimen 12A served to enhance the reliability of the evidence against defendant. And, in the matter under review, the passage of time did not force defendant to defend himself against stale evidence because the prosecution's case was based almost entirely on DNA evidence. We find no error in the trial court's conclusion that defendant's prosecution was not time-barred.

III.

Finally, we address defendant's argument that the sentence imposed by the trial court was manifestly excessive. Defendant also contends the court erroneously rejected mitigating factor one, N.J.S.A. 2C:44-1(b)(1) (defendant's conduct neither caused nor threatened serious harm), and mitigating factor two, N.J.S.A. 2C:44-1(b)(2) (defendant did not contemplate his conduct would cause or threaten serious harm).

A-0088-18T4

We review the trial court's sentencing decision under an abuse of discretion standard. State v. Jones, 232 N.J. 308, 318 (2018). In doing so, we consider whether: "(1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were . . . 'based upon competent credible evidence in the record'; [and] (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (third alteration in the original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

A court imposing sentences for multiple offenses must bear in mind that "'though a defendant's conduct may have constituted multiple offenses, the sentencing phase concerns the disposition of a single, not a multiple, human being.'" State v. Yarbough, 100 N.J. 627, 646 (1985) (quoting State v. Cloutier, 286 Or. 579, 591 (1979)). Therefore, when crafting a consecutive sentence, the sentencing court should make "an overall evaluation of the punishment for the several offenses involved." Yarbough, 100 N.J. at 646 (citing State v. Rodriguez, 97 N.J. 263, 274 (1984)).

To do so, a court examines criteria such as whether: (1) "the crimes and their objectives were predominantly independent of each other;" (2) "whether the crimes were committed at different times or separate places, rather than

being committed so closely in time and place as to indicate a single period of aberrant behavior;" (3) "any of the crimes involved multiple victims;" and, (4) "the convictions for which the sentences are to be imposed are numerous." Yarbough, 100 N.J. at 644. Because a trial court's imposition of a consecutive or concurrent sentence is discretionary, an appellate court reviews such a decision for abuse of discretion. State v. Spivey, 179 N.J. 229, 245 (2014).

Here, the sentencing court carefully considered the sentence it crafted after reviewing defendant's prior criminal history and the presentence report. While defendant argues the sentencing court inappropriately excised the word "serious" from mitigating factors one and two, the record shows that the court considered the seriousness of defendant's actions:

> In looking at the mitigating factors, looking at number [one], it says the defendant's conduct neither caused nor threatened serious harm. Committing an act of sexual contact upon someone and entering a dwelling without permission certainly does cause harm or the threat of harm, so I do not find number [one].
>
> Number [two] talks about the defendant did not contemplate his conduct would cause or threaten serious harm. Well, when you enter someone's home, criminal trespass without permission, and you commit an act of sexual contact with them, you have to contemplate that's going to cause some type of harm.
>
> And when I consider the facts of the case and the struggle that ensued to complete this sexual contact

A-0088-18T4

which the jury has found [defendant] guilty of, I do find that number [two] is not applicable.

Having reviewed the record, we reject defendant's argument that the court erred in not finding mitigating factors one and two were applicable. The sentencing court also engaged in an appropriate <u>Yarbough</u> analysis and aptly concluded "that the crime of a criminal sexual contact has absolutely no bearing on a crime of criminal trespass. The criminal trespass is complete once you enter that dwelling without a license or permission to be in there or a privilege to be in there." We agree with the sentencing court's conclusion that the crimes committed here were "predominately independent of each other."

The sentencing court provided a statement of reasons supporting its sentencing decision, the sentence is based on competent credible evidence in the record, the <u>Yarbough</u> factors were applied, and the sentence does not shock the judicial conscience. The court applied the aggravating factors and one mitigating factor and followed the appropriate sentencing guidelines. <u>State v. Bieniek</u>, 200 N.J. 601, 608 (2010) (quoting <u>Roth</u>, 95 N.J. at 364-65).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

22